## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- x

In re:                                           :    Chapter 11
                                                 :
PADDOCK ENTERPRISES, LLC                         :    Case No. 20-_____  (_____)
                                                 :
        Debtor.[1]                               :
                                                 :
--------------------------------------------------------- x

## DECLARATION OF DAVID J. GORDON, PRESIDENT
## AND CHIEF RESTRUCTURING OFFICER OF THE DEBTOR, IN
## SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, David J. Gordon, pursuant to 28 U.S.C. § 1764, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the President and Chief Restructuring Officer of Paddock Enterprises, LLC (the "**Debtor**").  The Debtor is organized under the laws of the state of Delaware.  I own and operate a management services business, DJG Services, LLC ("**DJG**"), through which I began working with the Debtor and its affiliates (collectively, the "**Company**") as a real estate consultant in November 2019.  Pursuant to a consulting contract between DJG and the Debtor's predecessor, I have served as President and Chief Restructuring Officer of the Debtor since December 18, 2019.  I am also the President and own 50% of DJO Services, LLC ("**DJO**").  DJO owns the equity interest in a number of currently non-operating companies that face asbestos personal injury litigation and provides management services to each of them.  In addition, I am the President of Fraser Boiler Service, Inc., which is the Debtor in a chapter 11 case involving asbestos mass tort and related insurance issues, which is currently pending in the Western District of Washington.  In

---

[1]    The last four digits of the Debtor's federal tax identification number are 0822.  The Debtor's mailing address is One Michael Owens Way, Perrysburg, Ohio 43551.

my personal capacity, I serve as Liquidating Trustee to the Oakfabco Liquidating Trust, as an independent director for two other companies, and as Director of Insurance and Litigation for a regional contractor in the Northwest.  Prior to starting DJO in 2015, I served as a vice president, and then President and Chief Executive Officer ("**CEO**") of The Flintkote Company ("**Flintkote**") from 2000-2017, including through its chapter 11 bankruptcy.  In my capacity as CEO of Flintkote, I also served as the CEO of the Plant Insulation Company from 2007-2012, including through its chapter 11 bankruptcy.  I also currently serve as the trustee for the Flintkote Trust.  From 1997-2003, I served in various capacities for Flintkote's ultimate parent, Imasco Holdings Group, Inc., including as the President of Roy Rogers Restaurants and as President of MRO Mid-Atlantic Restaurants.  Prior to that time, I served in senior counsel positions for Hardee's Food Systems, Inc. from 1987-1997 and Burger King Corporation from 1980-1987.  I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtor.

2.      I am responsible for overseeing the day-to-day operations of the Debtor, as well as developing and managing the real estate business of its wholly owned, non-Debtor subsidiary, Meigs Investments, LLC ("**Meigs**").  As a result of my experience with the Debtor, my review of public and non-public documents (including the Debtor's books and records), and my discussions with members of the Company's management team, I am generally familiar with the Debtor's business, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from Company employees, Company documents and/or the Debtor's professionals.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtor will continue to operate its business and manage its property as debtor-in-possession.

4.      I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for relief and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").  I have reviewed the Debtor's petition and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to avoid immediate and irreparable harm to the Debtor and to successfully maximize the value of the Debtor's estate.  References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on explanations provided by, and the advice of, counsel.

5.      The primary purpose of this case (the "**Chapter 11 Case**") is to address and comprehensively resolve the Debtor's legacy asbestos-related liabilities, which arise out of the production and distribution of certain asbestos-containing products by a former business unit of the Debtor's predecessor from 1948 to 1958, when that business unit was sold.  The Debtor intends to achieve this goal by promptly negotiating—and ultimately confirming—a plan of reorganization pursuant to sections 524(g) and 1129 of the Bankruptcy Code.  The Debtor believes that creation of a section 524(g) trust would be the fairest and most expeditious way for the Debtor to ensure that holders of current and future Asbestos Claims (as defined below) are treated in a fair and just manner.  The Debtor is confident that the tools and protections available in chapter 11 will facilitate negotiations that will ultimately result in a court-approved plan.

6.      Part I of this First Day Declaration describes the Debtor's historical asbestos-related liabilities and the events leading to the filing of this Chapter 11 Case.  Part II provides an overview of the Debtor's relevant corporate history and attributes, including the corporate modernization that it consummated on December 26-27, 2019.  Part III sets forth relevant facts in support of the First Day Pleadings.

I.      **THE DEBTOR'S ASBESTOS-RELATED LIABILITIES AND EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASE**

A.      **The Debtor's Limited Asbestos Operations and Ongoing Claiming Activity**

7.      The Debtor is the successor-by-merger to Owens-Illinois, Inc., which previously served as the ultimate parent of the Company.  The Debtor is annually subject to hundreds of claims and lawsuits alleging personal injuries and death from exposure to asbestos ("**Asbestos Claims**") contained in products manufactured under the "Kaylo" brand between 1948 and 1958, which were primarily pipe covering and block insulation products.  These products contained either chrysotile or amosite asbestos fibers, depending on the year of manufacture, and had extremely limited applications, such as for high temperature piping in large industrial settings.  As discussed further below, the Debtor's predecessor sold its entire Kaylo business to Owens Corning Fiberglass Corporation ("**Owens Corning**") in 1958 and has not manufactured or sold any Kaylo products since then.  No other entities within the Company were ever involved in the production or sale of Kaylo products.

8.      In April 1953, the Debtor's predecessor entered into a five-year sales agreement covering Kaylo products with Owens Corning, which then began distributing the product line.  Owens Corning subsequently purchased the Kaylo business in its entirety in April 1958 and, upon information and belief, owned and exclusively operated it until 1972.  Owens Corning filed for chapter 11 protection in October of 2000 and confirmed its plan of reorganization with a section

524(g) trust in September of 2006.  The Owens Corning 524(g) trust has been making payments on account of Kaylo-related asbestos claims since then.

9.      Despite having only produced Kaylo products for a fraction of the total production window, the Debtor continues to fund an outsized share of tort recoveries.  This situation arises in part because the section 524(g) trust system operates independently of the tort system, which allows for plaintiffs to recover from defendants in the tort system, collect their full damages, and then collect significant damages from trusts based on evidence they subsequently submit, even when it alleges exposure to the same product.  It also arises because the cost of defending asbestos claims in the tort system has risen.  The Debtor currently has approximately 900 personal injury lawsuits pending against it throughout the country, many of which are currently dormant in status. These lawsuits typically allege various theories of liability, including negligence, gross negligence and strict liability, and seek compensatory and, in some cases, punitive damages.  Each lawsuit requires the Debtor to incur a range of tens to hundreds of thousands of dollars or more in attorneys' fees and costs alone.

10.     In contrast to many other companies' pure litigation approach, however, most Asbestos Claims are presented to the Debtor through a variety of administrative claims-handling agreements ("**Administrative Claims Agreements**").  The Company long believed that it and its various stakeholders were best served by proactively managing its asbestos-related liabilities outside of the tort system through such agreements.  This strategy has historically allowed the Debtor more predictability in managing risk and its annual asbestos-related financial obligations. However, the Company's ability to reasonably estimate and reserve for the Debtor's asbestos-related tort expenditures has been significantly affected by, among other factors, changes in claiming patterns; changes in the law, procedure, and asbestos docket management; and pressure

5

on settlement values driven by co-defendant bankruptcies, adverse tort system developments, and the Debtor's status as one of the only remaining solvent "amosite" defendants. These factors have also made Administrative Claims Agreements—at least on existing payment terms—difficult to maintain, and therefore less reliable to the Debtor.

11.     The Company has for many years conducted an annual comprehensive legal review of its asbestos-related tort expenditures in connection with finalizing its annual results of operations in its public filings. Beginning in 2003, the Company had been estimating its asbestos-related tort expenditures based on an analysis of how far in the future it could reasonably estimate the number of claims it would receive, which was several years. In April 2016, the Company adjusted its method for estimating its future asbestos-related tort expenditures in compliance with accounting standards codification ("**ASC**") 450, *Contingencies*. With the assistance of an external consultant, and utilizing a model with actuarial inputs, the Company developed a new method for reasonably estimating its total asbestos-related tort expenditures, which made several adjustments to consider the probable losses for Asbestos Claims not yet asserted, as well as related costs it could properly include in its estimate.

12.     Although the Company did not record any additional asbestos-related charges at the end of 2016 or 2017, as of December 31, 2018, the revised methodology led the Company to (i) conclude that a charge of $125 million was necessary, which produced a year-end accrual of $602 million for reasonably probable asbestos-related tort expenditures and (ii) estimate that reasonably possible losses could result in asbestos-related tort expenditures up to $722 million (both stated in nominal dollars). The Debtor believes that, although the established reserves are appropriate under ASC 450, its ultimate asbestos-related tort expenditures cannot be known with certainty because, among other reasons, the litigation environment in the tort system has

deteriorated generally for mass tort defendants and Administrative Claims Agreements are becoming less reliable.

13.    What is certain is the incredible disparity between what the Debtor has historically paid, and is now being asked to pay, for Asbestos Claims, given the extent of its historical asbestos-related operations.  As of September 30, 2019, the Debtor had disposed of over 400,000 Asbestos Claims, and had incurred gross expense of approximately $5 billion for asbestos-related costs.  In contrast, its total Kaylo sales for the 10-year period in which it sold the product were approximately $40 million.  Asbestos-related cash payments for 2018, 2017, and 2016 alone were $105 million, $110 million, and $125 million, respectively.  Although these cash payments show a modest decline, the overall volume and claimed value of Asbestos Claims asserted against the Debtor has not declined in proportion to the facts that (i) over 60 years have passed since the Debtor exited the Kaylo business, (ii) the average age of the vast majority of its claimants is now over 83 years old, (iii) these demographics produce increasingly limited opportunities to demonstrate legitimate occupational Kaylo exposures, and (iv) other recoveries are available from trusts established by other asbestos defendants.  Rather, increasing settlement values have been demanded of the Debtor.  And because the Debtor has settled or otherwise exhausted all insurance that might cover Asbestos Claims, it must satisfy all asbestos-related expenses out of Company cash flows.

14.    For years, the Debtor has paid more for its Asbestos Claims than its industry peers whose liabilities are paid by section 524(g) trusts.  This is principally due to the inherent differences between the tort system and section 524(g) trust distribution procedures.  The procedural and legal differences even among different jurisdictions in the tort system—such as joint-and-several liability—allow these disparities to exist in the extreme, which usually results in

US-DOCS\111491121RLF1 22687898v.1

the Debtor paying different claim amounts to otherwise similarly-situated plaintiffs.  This situation is neither fair to the Company and its stakeholders nor to asbestos claimants.

15.     The Debtor remains committed—as it has since the first Asbestos Claim brought against it—to fairly and equitably compensating claimants who are ill and have legitimate exposure to Kaylo products that the Debtor's predecessor last manufactured more than 60 years ago.  However, because the Company continues to face claims that increase in value, despite the fact that one would reasonably expect claims arising from the relevant manufacturing period to tail off and become more difficult to prove, the Debtor has concluded—consistent with the Company's overall strategy of rationalizing and streamlining expenses—that the best path for fairness, certainty, and finality is only available through this Chapter 11 Case.

### B.     Engagement of Professionals

16.     In order to explore potential alternatives to the status quo, the Debtor engaged its outside counsel, Latham & Watkins LLP ("**Latham**"), to assist it in evaluating a number of strategic options.  It also retained Bates White LLC ("**Bates White**") to provide estimation-related guidance with respect to its Asbestos Claims.  The Debtor believes that guidance from both Latham and Bates White will assist it in reaching a consensual resolution in this Chapter 11 Case.

17.     As part of this exploratory effort and to facilitate the implementation of a potential chapter 11 strategy if and when authorized to do so, the Debtor also entered into an engagement letter with James L. Patton, Jr. of Young, Conaway, Stargatt & Taylor, LLP ("**Young Conaway**") on October 30, 2019 to serve as a proposed future claims representative (the "**Proposed FCR**") to represent the interests of individuals who may assert Asbestos Claims in the future.  The Debtor chose the Proposed FCR after interviewing and considering several qualified candidates, ultimately selecting James Patton based upon his qualifications and experience. The Proposed FCR retained Young Conaway as counsel and Ankura Consulting Group LLC as claims analyst to

provide advice in connection with such representation. Together with his advisors, the Proposed FCR initiated an extensive diligence process into the Debtor's Asbestos Claims, subject to a confidentiality agreement. The Debtor has worked constructively with the Proposed FCR and his advisors throughout this process by producing over 1,600 pages of documents and written responses to his information requests, as well as by attending in-person and telephonic diligence meetings, among other things.

18.     The Debtor intends to seek the appointment of Mr. Patton as the future claimants' representative in connection with this Chapter 11 Case. Given the knowledge of the Debtor's business and Asbestos Claims that Mr. Patton has gained during the prepetition diligence process, the Debtor believes his appointment will result in efficiencies that benefit creditors and the estate.

**C.     Ultimate Decision to File for Chapter 11**

19.     Managing Asbestos Claims has always been a mix of legal art and science and something on which the Debtor has prided itself. The laws and the circumstances, however, have changed over time and the Debtor is no longer confident that it can appropriately and reliably manage these claims outside of a chapter 11 process. In contrast, the large number of asbestos defendants that have successfully navigated chapter 11 and confirmed section 524(g) plans (none of whom exited asbestos-related manufacturing over 60 years ago or have the Debtor's uniquely limited cohort of claimants) leads the Debtor to be confident that it too can reach a successful resolution as to its Asbestos Claims in chapter 11.

20.     Thus, after extensive discussions with its advisors, the Debtor determined that commencement of this Chapter 11 Case would best position it to obtain certainty and finality in its funding obligations, in a manner that is fair and just to current and future asbestos claimants, and is in the best interests of the Debtor's estate and stakeholders. Accordingly, on January 5, 2020, the Debtor's board of managers authorized the filing of this Chapter 11 Case.

US-DOCS\111491121RLF1 22687898v.1

21.     Based on my experience, I believe that chapter 11 provides the only avenue for all of the Asbestos Claims asserted, and to be asserted, against the Debtor to be comprehensively addressed in a single forum under a process that fosters integrity through application of the rules of evidence and the rule of law.  It will avoid the unending process inherent in the state court system and, perhaps more importantly, avoid the risk that some claimants who are otherwise similarly-situated may fare better than others, based only on when their claim is asserted, where, and by which law firm.  In short, chapter 11 will provide the Debtor with the statutory framework and tools necessary to finally and fairly resolve its liability for Asbestos Claims, while unlocking the growth potential for the Company and its businesses, and for the benefit of all stakeholders.

## II.    THE DEBTOR'S RELEVANT CORPORATE HISTORY AND ATTRIBUTES

### A.    The Debtor's Organizational Structure

22.     There is one Debtor in this case.  The Debtor was incorporated in Delaware in 2019 and maintains its headquarters in Perrysburg, Ohio.  The Debtor has one operating subsidiary, Meigs.  As shown in the simplified corporate organization chart attached as Exhibit A and as described in further detail below, the Debtor is a direct, wholly owned subsidiary of O-I Glass, Inc. ("**Current Parent**").  Current Parent is a public company with shares traded on the New York Stock Exchange.  Current Parent holds 100% of the interests in Owens-Illinois Group, Inc. ("**O-I Group**"), which in turn directly or indirectly holds all of the Company's subsidiaries other than the Debtor and Meigs.

23.     The Company is the largest manufacturer of glass container products in the world, with 78 glass manufacturing plants in 23 countries.  The Company's principal product lines are glass containers for alcoholic beverages, including beer, flavored malt beverages, spirits and wine, a variety of food items, soft drinks, teas, juices and pharmaceuticals.  The Company's segments include Europe, the Americas and Asia Pacific.  It also provides engineering support for its glass

manufacturing operations through facilities located in the United States, Australia, France, Poland and Peru.  As of December 31, 2019, the Company employed approximately 27,500 individuals worldwide.

      **B.**     **Corporate Modernization Transaction**

     24.     Recognizing that, within its corporate structure, the Company's asbestos-related liability was located at the level of the Debtor's predecessor, Owens-Illinois, Inc., the Company underwent a corporate restructuring pursuant to section 251(g) of the Delaware General Corporation Law (the "**Corporate Modernization Transaction**") in December 2019.  The Company undertook the Corporate Modernization Transaction to structurally separate the legacy liabilities of the Debtor's predecessor, Owens-Illinois, Inc., from the active operations of Owens-Illinois, Inc.'s subsidiaries, while fully maintaining the Debtor's ability to access the value of those operations to support its legacy liabilities.  I understand that, as a result of the Corporate Modernization Transaction, Owens-Illinois, Inc. ceased to exist for corporate purposes under Delaware law and two new entities were created:  (i) the Debtor, into which Owens-Illinois, Inc. merged, and (ii) Current Parent, which became the Company's new publicly traded parent.  I understand that, for all U.S. federal tax purposes, Current Parent is treated as a continuation of Owens-Illinois, Inc.  In addition, (x) certain assets of Owens-Illinois, Inc., which became assets of the Debtor as a matter of law upon the Merger (as defined below), were distributed as a dividend to Current Parent, (y) certain obligations of Owens-Illinois, Inc., which became obligations of the Debtor by operation of Delaware law upon the Merger, were assumed by Current Parent, and (z) Debtor and Current Parent entered into a Support Agreement and a Services Agreement providing the Debtor with corporate and other shared services.  These steps are further described below.

     25.     First, Owens-Illinois, Inc. undertook a holding company reorganization under the General Corporation Law of the State of Delaware, pursuant to which Owens-Illinois, Inc. formed

Current Parent as a direct, wholly owned subsidiary.  Current Parent then formed the Debtor to serve as a merger subsidiary.  Pursuant to an agreement and plan of merger (the "**Merger Agreement**"), Owens-Illinois, Inc. merged with and into the Debtor, with the assets and liabilities of Owens-Illinois, Inc. vesting in the Debtor as the surviving entity (the "**Merger**") by operation of Delaware law.  Upon the effectiveness of the Merger, each share of Owens-Illinois, Inc. stock held immediately prior to the Merger automatically converted into a right to receive an equivalent corresponding share of Current Parent stock, having the same designations, rights, powers and preferences and the qualifications, limitations, and restrictions as the corresponding share of Owens-Illinois, Inc. stock being converted.  After the Corporate Modernization Transaction, Owens-Illinois, Inc.'s stockholders became stockholders of Current Parent.

26.     In connection with the modernization, the Debtor distributed all of the shares of capital stock of O-I Group to Current Parent, and entered into an Assumption and Assignment Agreement through which certain contracts of Owens-Illinois, Inc. (including employee benefits plans) that the Debtor succeeded to as a result of the Merger by operation of Delaware law, were assigned to Current Parent (the "**Distribution**").  In connection with and prior to the Distribution, Current Parent entered into the Support Agreement with the Debtor, which is designed to ensure that the Debtor remains solvent, and a Services Agreement, which maintains the Debtor's access to generalized corporate services and resources.

27.     The Company undertook the Corporate Modernization Transaction to further its strategy of improving the Company's operating efficiency and cost structure, while ensuring the Debtor remains well-positioned to address its legacy liabilities.  The Debtor believes that the corporate structure resulting from the Corporate Modernization Transaction aligns with the Debtor's goal of resolving its legacy liabilities fairly and finally, in a way that maximizes value

US-DOCS\111491121RLF1 22687898v.1

for all parties. The Corporate Modernization Transaction also helped ensure that the Debtor has

the same ability to fund the costs of defending and resolving present and future Asbestos Claims

as Owens-Illinois, Inc. did, through Debtor's retention of (i) its own assets to satisfy these claims

and (ii) access to additional funds from the Company through the Support Agreement. In short,

the Corporate Modernization Transaction made good sense on a standalone, operational basis, and

was also consistent with any bankruptcy strategy the Debtor might undertake.

### C.    Support Agreement

28.    As part of the Corporate Modernization Transaction, Current Parent entered into a

support agreement with the Debtor (the "**Support Agreement**"), a true and correct copy of which

is attached as Exhibit B. The Support Agreement is not a loan agreement. Instead, without any

corresponding repayment obligation by the Debtor, it requires Current Parent to provide funding

for all "Permitted Uses", subject to the terms of the Support Agreement. The key objective of the

Support Agreement is to ensure that the Debtor has the same ability to fund the costs of managing

and paying Asbestos Claims as Owens-Illinois, Inc., which funded asbestos-related liabilities out

of cash funded from its subsidiaries.

### D.    Services Agreement

29.    In connection with the Corporate Modernization Transaction and to ensure that the

Debtor has access to the necessary resources and services to operate its business, the Debtor and

Current Parent entered into a services agreement (the "**Services Agreement**"), pursuant to which

Current Parent provides the Debtor with certain centralized corporate and administrative services,

including, but not limited to, legal, accounting, tax, human resources, information technology, risk

management and other support services (including information retention and records management)

as are necessary to operate the Debtor's business and support its operations (including any needed

support of Meigs) (the "**Services**").  The Debtor is invoiced quarterly, on an allocated basis, for Services expenses based on a projected annual budget, which is trued-up at the end of each year based on actual costs.  Amounts due under the Services Agreement are included as Permitted Uses under the Support Agreement.

   E.   **The Debtor's Business Operations and Assets**

   30.   The Debtor's business operations are exclusively focused on (1) owning and managing certain real property and (2) owning interests in, and managing the operations of, its non-Debtor subsidiary, Meigs, which is developing an active real estate business.  In addition, the Debtor is responsible for managing its historical asbestos and environmental liabilities through resources available under the Services Agreement and outside advisors.  In addition to amounts due under the Services Agreement, the Debtor also incurs certain direct costs related to independent director fees, consulting costs, legal fees, and other charges.  The Debtor has no employees.

   31.   The Debtor owns one parcel of real property in Lapel, Indiana, on which an affiliate owns and operates a glass manufacturing plant (the "**Lapel Property**").  The Debtor acquired the Lapel Property from Owens-Brockway Glass Container Inc. ("**OBGC**") prior to the Petition Date and leased it back to OBGC under a 15-year triple net lease, subject to renewal (the "**Ground Lease**").  The Ground Lease is expected to generate net rents totaling approximately $110,000 in annual revenue.  In connection with the sale and leaseback of the Lapel Property, the Debtor obtained an appraisal and capitalization rates from CBRE.  The Debtor intends to manage and derive revenue from the Ground Lease business during the Chapter 11 Case and after emergence.

   32.   In addition to the Ground Lease, through Meigs, the Debtor holds one property and is under contract to purchase another property, both subject to triple-net leases of quick-service

restaurants with national, third-party quick-service restaurant brands (the "**Existing Properties**"). The Existing Properties are expected to generate net rents totaling approximately $216,000 in revenue in 2020, subject to increase in later years. In connection with owning and managing the Existing Properties, Meigs (as directed by the Debtor, as its sole member) performs the various tasks associated with its property management business, including periodic inspections of the properties for compliance with lease terms, management of tenants' lease obligations such as tax, common area charges and insurance, and resolving disputes, if any. The Debtor will continue to assess opportunities to expand Meigs' portfolio to provide income and asset value growth to its real estate business during the Chapter 11 Case.

33.    In addition to these assets, the Debtor held approximately $40.6 million in cash in its bank account as of the Petition Date. These funds derived from a combination of (i) an initial payment under the Support Agreement and (ii) additional cash left behind at Owens-Illinois, Inc. in the Corporate Modernization Transaction, which became cash of the Debtor upon the Merger. The Debtor may also hold *de minimis* other assets to which it became entitled as a matter of Delaware law pursuant to the Merger.

**F.    Debtor's Capital Structure and Liabilities**

34.    As noted above, the Debtor is a wholly owned subsidiary of Current Parent. The Debtor has no funded debt as of the Petition Date. The Debtor's most significant liabilities relate to its Asbestos Claims (as discussed in greater detail in Part I.A above). The Debtor also has legacy environmental liabilities (which are dwarfed by asserted Asbestos Claims) and has *de minimis* other contested prepetition liabilities arising from pending non-asbestos-related litigation.

35.    Environmental Liabilities. The Debtor has historical environmental liabilities related to, among other things, Owens-Illinois, Inc.'s prior operation of certain facilities, including,

but not limited to, in Ohio, Kentucky, Connecticut, New Jersey, and Georgia.  The Debtor's

liabilities with respect to these facilities relate to penalties for site closures, remediation expenses,

exposure for cleanup of contamination, and alleged noncompliance with regulations.  The Debtor

also has liabilities associated with Owens-Illinois, Inc.'s involvement in a number of other

administrative and legal proceedings regarding the responsibility for the cleanup of hazardous

waste or damages claimed to be associated with it and with Owens-Illinois, Inc.'s involvement in

some minor claims for environmental remediation of properties sold to third parties.

III.     **FIRST DAY PLEADINGS**[2]

36.     To preserve value for all stakeholders, the Debtor has sought approval of the First

Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully requests that the

Court consider entering the Proposed Orders granting such First Day Pleadings.  The Debtor seeks

authority, but not direction, to pay amounts or satisfy obligations with respect to the relief

requested in any of the First Day Pleadings.

37.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits

thereto (or have otherwise had their contents explained to me), and the facts set forth therein are

true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the

relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtor to make the

transition to, and operate in, chapter 11 with minimum interruptions and disruptions to its business

or loss of value and (b) constitutes a critical element in the Debtor's being able to successfully

maximize value for the benefit of its estate.

---

[2]     Unless otherwise defined herein, all capitalized terms in this Section shall have the meanings ascribed to them in
the applicable First Day Pleadings.

US-DOCS\111491121RLF1 22687898v.1

A.    **Motion to Limit Notice and Approve Notice Procedures**[3]

38.    In the Motion to Limit Notice and Approve Notice Procedures, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to file a list of the top 24 law firms with the most significant Asbestos Claimant (as defined in the Motion to Limit Notice and Approve Notice Procedures) representations as determined by the volume and value of payments made on account of Asbestos Claims asserted against the Debtor in lieu of a list of the holders of the top 20 largest unsecured claims; (ii) approving the implementation of notice procedures by which the Debtor shall (a) list the addresses of known counsel of record for the Asbestos Claimants and known counsel under the Administrative Claims Agreements, in lieu of the addresses of the Asbestos Claimants themselves, on the Debtor's creditor matrix and (b) send required notices, mailings, and other communications related to the Chapter 11 Case to such known counsel of record for the Asbestos Claimants and known counsel under the Administrative Claims Agreements in lieu of sending such notices, mailings, and other communications directly to the Asbestos Claimants themselves (the "**Notice Procedures**"); and (iii) granting related relief.

1.    *List of 24 Law Firms with the Most Significant Asbestos Claimant Representations*

39.    As described herein, the Debtor is currently subject to Asbestos Claims presented to the Debtor through Administrative Claims Agreements and is also named as a defendant in pending Asbestos Claim litigation. The vast majority of the Debtor's known creditors are Asbestos Claimants. As a result, the Debtor anticipates that the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") will appoint an official committee of asbestos claimants to represent the interests of the Asbestos Claimants in the Chapter 11 Case. The Debtor does not

---

[3]    "**Motion to Limit Notice and Approve Notice Procedures**" means the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Filing of a List of the Top 24 Law Firms Representing Asbestos Claimants, (II) Approving Certain Notice Procedures for Asbestos Claimants, and (III) Granting Related Relief.*

US-DOCS\111491121RLF1 22687898v.1

expect that the U.S. Trustee will also seek to appoint a separate official committee comprised solely of holders of non-asbestos claims against the Debtor as the Debtor has relatively few unsecured creditors compared to the number of Asbestos Claimants.

40.    I do not believe that listing individual Asbestos Claimants with the largest unsecured claims against the Debtor would facilitate the U.S. Trustee's appointment of an asbestos claimants creditors' committee.  I believe attempting to designate certain individual Asbestos Claimants as holding the "largest" unsecured claims would be arbitrary.  The vast majority of pending Asbestos Claims are disputed, contingent, and/or unliquidated and therefore would be incredibly difficult to value.  I therefore believe that providing the U.S. Trustee with a list of the top 24 law firms with the most significant Asbestos Claimant representations as determined by the volume and value of payments made on account of Asbestos Claims asserted against the Debtor in lieu of a list of the 20 largest unsecured claims against the Debtor would better assist the U.S. Trustee in forming such a committee.

41.    I understand that most Asbestos Claimants present Asbestos Claims to the Debtor through Administrative Claims Agreements.  The Debtor usually resolves such Asbestos Claims promptly after receiving a qualifying submission from the applicable plaintiffs' law firm and therefore does not have many pending (i.e., submitted-but-unresolved) claims on its books and records.  Accordingly, in order to identify the top plaintiffs' firms, the Debtor reviewed historical data of which firms have submitted the highest volume of Asbestos Claims and have resolved the highest value of Asbestos Claims in the past 10 years.  In addition to listing the law firms with the most significant Asbestos Claimant representations as determined by volume and value of payments, I understand that the Debtor also included any law firms representing Asbestos

Claimants with any unpaid but liquidated Asbestos Claims in excess of $200,000 as of the Petition Date.

### 2.      *The Asbestos Claimant Notice Procedures*

42.      In the Motion to Limit Notice and Approve Notice Procedures, the Debtor also seeks to implement the Notice Procedures by which the Debtor will (i) list the addresses of known counsel of record for the Asbestos Claimants and known counsel under the Administrative Claims Agreements, in lieu of the addresses of the Asbestos Claimants themselves, on the Debtor's creditor matrix and (ii) send required notices, mailings, and other communications related to the Chapter 11 Case to such known counsel of record for the Asbestos Claimants and known counsel under the Administrative Claims Agreements in lieu of sending such communications directly to the Asbestos Claimants themselves.

43.      I understand that the Debtor does not routinely receive individual address information for Asbestos Claimants in Asbestos Claim litigation or under Administrative Claims Agreements, and therefore does not track or retain such information.  As described above, for claims submitted under the Administrative Claims Agreements, the Debtor usually resolves such Asbestos Claims promptly after receiving a qualifying submission from the applicable plaintiffs' law firm and therefore does not have many pending (i.e., submitted-but-unresolved) claims on its books and records.  Further, the Debtor rarely receives contact information for such Asbestos Claimants pursuant to Administrative Claims Agreements.[4]   For Asbestos Claims pending in the tort system, the Debtor tracks the Asbestos Claimant's name, but ordinarily the pleadings and

---

[4]    I understand that the Debtor does have some identifying personal information about certain Asbestos Claimants for certain settled-but-unpaid claims existing as of the Petition Date, as well as some submitted Asbestos Claims that remain unresolved as of the Petition Date.  However, the Debtor generally is not given and does not have contact information for such Asbestos Claimants.

publicly available discovery materials do not contain identifying contact information for such plaintiffs.

44.    Instead, I understand that the Debtor typically tracks the address information of the counsel and/or law firm of record for the Asbestos Claimants in the tort system and named counsel party to the Administrative Claims Agreements, and conducts all communications regarding the related litigation and/or pending claims and Asbestos Claims through such counsel. Collecting the individual addresses of the Asbestos Claimants, I believe, would require a massive, expensive and time-consuming effort, including a search beyond the Debtor's existing books and records. Even if the Debtor did undergo this effort, I believe that it would likely be near impossible to locate and ensure the accuracy of such information for each Asbestos Claimant. As a result, the Debtor requests authority to list the addresses of the counsel of record for each Asbestos Claimant and named counsel under the Administrative Claims Agreements instead of the addresses of individual Asbestos Claimants on the Debtor's creditor matrix.

45.    In addition, I understand that throughout the course of the Chapter 11 Case, various notices, mailings, and other communications will need to be sent to the Asbestos Claimants. In order to ensure that these claimants receive proper and timely notice of filings and critical events in the Chapter 11 Case, the Debtor requests authority to direct Prime Clerk, LLC, the Debtor's proposed claims and noticing agent (the "**Claims and Noticing Agent**"), to send required notices, mailings, and other communications to the counsel of record for the Asbestos Claimants and named counsel under the Administrative Claims Agreements, in the manner required pursuant to otherwise applicable noticing procedures in effect in the Chapter 11 Case, *provided* that the Debtor will (or will direct the Claims and Noticing Agent to) send required notices, mailings, and other communications directly to any Asbestos Claimants who so request such direct notice from the

Debtor in writing.  As to those Asbestos Claimants, if any, whose personal addresses are known to the Debtor, the Debtor shall send required notices, mailings, and other communications related to the Chapter 11 Case to such Asbestos Claimants at their personal addresses, as well as to their known counsel.  Additionally, for those law firms representing multiple Asbestos Claimants (including those law firms party to the Administrative Claims Agreements), the Debtor seeks authorization to serve each document only a single time on such law firms (at each relevant address) on behalf of all such counsel's clients, *provided* that any notice or other document relating specifically to one or more particular Asbestos Claimants (rather than all Asbestos Claimants represented by such law firm) shall clearly identify such parties.

46.    I believe that by implementing the Notice Procedures, the actual notice that Asbestos Claimants will receive via their counsel will be superior to the notice that the Asbestos Claimants would receive if the Debtor were to attempt to deliver notices and other communications directly to such claimants.  In addition, I understand that the address for counsel to the Asbestos Claimants is more likely to remain unchanged over time, and hence providing notice to the counsel of record will allow for more accurate notice to Asbestos Claimants.  Moreover, I believe that the Notice Procedures will also significantly ease the Debtor's administrative burden of sending notices to thousands of Asbestos Claimants, resulting in a more cost-effective notice procedure that benefits the Debtor's estate and creditors.

### B.    Claims Agent Retention Application[5]

47.    Pursuant to the Claims Agent Retention Application, the Debtor is seeking entry of an order appointing Prime Clerk, LLC ("**Prime Clerk**"), as claims and noticing agent in the

---

[5]    "**Claims Agent Retention Application**" means the *Application of Debtor for Appointment of Prime Clerk LLC as Claims and Noticing Agent.*

Chapter 11 Case, effective as of the Petition Date, to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Case.  It is my understanding that the Debtor's selection of Prime Clerk to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtor has obtained and reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I understand that, based on all engagement proposals obtained and reviewed, Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

48.     Although the Debtor has not yet filed its schedules of assets and liabilities, it anticipates that there will be in excess of 200 entities to be noticed.  In view of the number of anticipated claimants, I understand that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f), and I believe that it is otherwise in the best interests of both the Debtor's estate and its creditors.

C.     **Cash Management and Services Agreement Motion[6]**

1.     *The Cash Management System*

49.     I understand that the Debtor maintains a bank account (the "**Bank Account**") at Fifth Third Bank (the "**Bank**"), into which all rent payments received pursuant to the Ground Lease are deposited, and which serves as the Support Account into which the proceeds of all payments made pursuant to the Support Agreement are deposited.  I have been informed that, as of the Petition Date, the Bank Account holds approximately $40.6 million in cash, derived from

---

[6]     "**Cash Management and Services Agreement Motion**" means the *Motion of Debtor for Entry of Interim and Final Orders Authorizing Debtor to (I) Maintain Cash Management System, Bank Account, and Business Forms, (II) Perform Under Services Agreement, and (III) Granting Related Relief.*

(i) an initial payment under the Support Agreement and (ii) additional cash left behind at Owens-Illinois, Inc. in the Corporate Modernization Transaction, which became cash of the Debtor upon the Merger.  Additionally, I understand that, pursuant to the Support Agreement, Current Parent is required to make available funding to maintain a balance of at least $5 million in the Bank Account. All proceeds from the Debtor's operations (and funding provided pursuant to the Support Agreement) are deposited into the Bank Account, and all disbursements, including checks, drafts, wires, and automated clearing house transfers, are issued from the Bank Account.  The Bank Account was established in connection with the Corporate Modernization Transaction and it is my understanding that the Debtor has never held a bank account other than the Bank Account.

50.    The Debtor may use a variety of preprinted business forms, including checks, letterhead, correspondence forms, invoices, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "**Business Forms**"). To avoid a significant disruption to the Debtor's operations that would result from a disruption of the Debtor's cash management system (the "**Cash Management System**"), and to avoid unnecessary expense, the Debtor is requesting authority to continue using all Business Forms in use before the Petition Date, including with respect to the Debtor's ability to update authorized signatories and services, as needed—without reference to the Debtor's status as a chapter 11 debtor-in-possession—rather than requiring the Debtor to incur the expense and delay of ordering or printing new Business Forms.  I understand that the Debtor will use reasonable efforts to have the designation "Debtor-in-Possession" and the corresponding bankruptcy case number printed on any Business Forms reordered after the Debtor exhausts its existing supply.

51.    I have been informed that the Debtor incurs periodic service charges and other fees in connection with maintenance of the Cash Management System (the "**Bank Fees**").  The Bank

Fees are paid monthly and are automatically deducted from the Bank Account as they are assessed by the Bank.  As of the Petition Date, I believe that any Bank Fees outstanding are *de minimis*.

> **2.     *The Services Agreement***

52.     I believe that the Services Agreement is of vital importance to the Debtor as without the Services Agreement, the Debtor (which does not have any of its own employees, much less the infrastructure to support its back-office requirements) would be unable to perform basic legal, finance, corporate, administrative, and other tasks necessary to support its business operations. The Services Agreement allows the Debtor to operate its treasury system, maintain its books and records, and comply with applicable tax requirements.  Under the Services Agreement, the Debtor also has access to certain critical employees with historical knowledge relating to the defense and management of the Debtor's asbestos liabilities, and expertise relating to such matters. Accordingly, I believe that Current Parent's (and/or its affiliates') provision of services to the Debtor under the Services Agreement results in efficiencies and saved costs.

53.     Pursuant to the Services Agreement, the Debtor (together with Meigs and any future subsidiaries that the Debtor may form, each a "**Service Recipient**") is eligible to receive one or more services (collectively, the "**Services**") from Current Parent (together with its subsidiaries other than the Debtor and its subsidiaries, each a "**Service Provider**") set forth in <u>Exhibit A</u> of the Service Agreement, which are incorporated by reference herein, on an as-needed basis.[7]  The Services Agreement includes the following key financial terms:[8]

- <u>Service Fees</u>.  Each Service will be provided to Service Recipient at Service Provider's Cost (as defined below), as determined by Current Parent in its

---

[7]   Current Parent may also, in its sole discretion, engage or otherwise subcontract with third parties to assist with the performance of any Services under the Services Agreement.

[8]   The summary contained herein is qualified in its entirety by the provisions of the Services Agreement.  To the extent that anything in this Declaration is inconsistent with the terms of the Services Agreement, the Services Agreement will control.

reasonable discretion, in accordance with <u>Exhibit B</u> to the Services Agreement. The term "**Cost**" represents the direct cost to provide a Service. The intent is to assign to the Service all direct costs, including direct labor, direct supervision, benefits, travel and related costs, service-related training, and any direct third-party costs incurred to provide the Service. Average departmental labor rates are normally used to charge direct labor to a product or Service. Actual material purchase prices are used to charge direct materials to a product or Service.

- <u>Billing</u>. Current Parent will determine by line item in <u>Exhibit A</u> to the Services Agreement the projected cost of Services to be provided in the calendar year, and will deliver this projection to the Debtor on or before March 1 of such calendar year and every year thereafter. Once agreed, the sum total of these projected costs will be charged to the Debtor in advance in four equal quarterly installments. At the conclusion of each year, Current Parent will determine the actual cost of the Services provided during the year and provide a comparison to the projected costs to the Debtor by March 1 of the following year. Once agreed, any differences between the actual costs and the projected costs charged during the year will be credited or charged, as applicable, to the Debtor on the first quarterly invoice billed in the following year.

- <u>Change Requests and Amendments</u>. If Current Parent or the Debtor desires a change in the scope of the Services, the party requesting the change will submit a written request for change of Service (the "**Change Request**"). Within 30 days after receipt of the Change Request, Current Parent and the Debtor will negotiate in good faith regarding mutually acceptable changes in the scope of the Services. Current Parent and the Debtor may substitute one or more revised versions of <u>Exhibit A</u> to the Services Agreement as they mutually agree to from time to time.

54. I have been informed that the estimated cost of receiving the Services the Debtor currently receives under the Services Agreement will total approximately $300,000 to $450,000 per quarter in 2020. I understand that the Debtor's payments to Current Parent under the Services Agreement are a Permitted Use under the Support Agreement and thus, subject to the terms of the Support Agreement, Current Parent has funding obligations to the Debtor that correspond to the Debtor's obligations under the Services Agreement.

55. I believe that this cost is reasonable in light of the scope of the Services and the facts of the Chapter 11 Case, and that the Court should authorize the Debtor to continue to perform under the Services Agreement. In particular, I believe that the anticipated allocated cost is fair and

appropriate, and that the Debtor would be unable to receive the Services at a similarly competitive cost in the marketplace.

## **CONCLUSION**

56.      As discussed above, the Debtor's ultimate goal in this Chapter 11 Case is to confirm a plan of reorganization providing for a trust mechanism that will address all current and future Asbestos Claims against the Debtor while simultaneously preserving value and allowing the Debtor to emerge from chapter 11 free of asbestos-related liabilities.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving confirmation of a chapter 11 plan will be substantially enhanced.

57.      I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of January, 2020.


_/David J. Gordon/_
David J. Gordon
President and Chief Restructuring Officer of
Paddock Enterprises, LLC

**Exhibit A**

**Simplified Company Organizational Chart**



**Exhibit B**

**Support Agreement**

EXECUTION VERSION

## SUPPORT AGREEMENT

This SUPPORT AGREEMENT, dated as of December 27, 2019 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement"), is between O-I Glass, Inc., a Delaware corporation ("Payor"), and Paddock Enterprises, LLC, a Delaware limited liability company ("Payee").

## RECITALS

A.     The predecessor of Payee (the "Predecessor") has received thousands of claims from individuals alleging bodily injury and death as a result of exposure to asbestos from a product manufactured by the Predecessor between 1948 and 1958. Payee is currently a defendant in approximately 900 lawsuits alleging such claims, and expects to continue to receive such claims, both informally and through additional lawsuits. As a result, Payee has considered seeking relief under the Bankruptcy Code (as defined below) for the purpose of confirming a Plan (as defined below).

B.     Payor is the sole member of Payee and Payee is intended to be treated as an entity disregarded as separate from Payor solely for U.S. federal tax and applicable state and local tax purposes.

C.     On December 25, 2019, the Board of Payor approved (1) execution and delivery of the Assignment and Assumption Agreement; and (2) execution and delivery of this Agreement.

D.     On December 26, 2019, the Board of Payee approved (1) a dividend resulting in the distribution of all equity shares in Owens-Illinois Group, Inc. ("O-I Group"), a Delaware corporation and wholly-owned subsidiary of Payee, to Payor (the "Dividend"); (2) execution and delivery of the Assumption and Assignment Agreement (as defined below) (the "Assignment"); and (3) execution and delivery of this Agreement.

E.     On December 26, 2019, effective immediately after the effective time of the Merger, the Assignment became effective.

F.     On the date hereof, effective as of 7 a.m. prevailing Eastern Time (the "Dividend Effective Time"), all shares of O-I Group will be distributed to Payor, in its capacity as sole member of Payee, and Payee will retain all other assets it holds as of the Dividend Effective Time.

G.     In connection with, and effective just prior to the Dividend Effective Time (the "Agreement Effective Time"), Payor has agreed, pursuant to the terms of this Agreement, to provide support to Payee sufficient to pay the costs of operating Payee's business, as well as to satisfy all other liabilities of Payee specified herein (the "Covered Liabilities") on the terms set forth herein, such that, at and following the Dividend Effective Time, Payee has and will have assets having a value greater than its liabilities and will have financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities (as defined below) and Environmental Liabilities (as defined below).

## AGREEMENT

In consideration of the foregoing, the parties hereto agree as follows:

1.     **Definitions**.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"524(g) Confirmation Order" has the meaning set forth in the definition of "Permitted Use".

"524(g) Plan" has the meaning set forth in the definition of "Permitted Use".

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Agreement" has the meaning specified in the preamble of this Agreement.

"Asbestos Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Assignment" has the meaning specified in the recitals to this Agreement.

"Assumption and Assignment Agreement" means that certain Assumption and Assignment Agreement dated as of December 26, 2019 between Payor and Payee.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of: (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit; and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Wilmington, Delaware or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

US-DOCS\111457162

"<u>Confirmation Order</u>" means either a 524(g) Confirmation Order or a Non-524(g) Confirmation Order.

"<u>Contractual Obligation</u>" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"<u>Covered Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Default</u>" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"<u>District Court</u>" means the United States District Court in the district of the Bankruptcy Court.

"<u>Dividend</u>" has the meaning specified in the recitals to this Agreement.

"<u>Dividend Effective Time</u>" has the meaning specified in the recitals to this Agreement.

"<u>Environmental Liabilities</u>" has the meaning set forth in Schedule 2 to this Agreement.

"<u>Event of Default</u>" has the meaning specified in Section 6.

"<u>Federal Funds Effective Rate</u>" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"<u>GAAP</u>" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.  If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"<u>Governmental Authority</u>" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>Initial Payment</u>" has the meaning specified in Section 2(a).

"<u>Merger</u>" means the merger of Owens-Illinois, Inc. with and into Payee pursuant to the terms of the Merger Agreement.

3

"<u>Merger Agreement</u>" means that certain Agreement and Plan of Merger dated as of December 26, 2019 by and among Owens-Illinois, Inc., a Delaware corporation, Payor, and Payee (as it may be amended, restated, modified or supplemented from time to time).

"<u>Non 524(g) Confirmation Order</u>" has the meaning set forth in the definition of "Permitted Use".

"<u>Non 524(g) Plan</u>" has the meaning set forth in the definition of "Permitted Use".

"<u>O-I Group</u>" has the meaning specified in the recitals to this Agreement.

"<u>Organizational Documents</u>" means, (a) with respect to any corporation, its certificate or articles of incorporation and bylaws, (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement, and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"<u>Payee</u>" has the meaning specified in the preamble of this Agreement.

"<u>Payee Material Adverse Effect</u>" means (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement, or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"<u>Payee Subsidiary</u>" means any wholly-owned Subsidiary of the Payee and for avoidance of doubt shall exclude the Payor and the Payor Affiliates.

"<u>Payment</u>" has the meaning specified in Section 2(a).

"<u>Payment Cap</u>" means the sum of (x) the fair market value of the equity shares in O-I Group subject to the Dividend and (y) the net value of assets, if any, subject to the Assignment.

"<u>Payment Date</u>" has the meaning specified in Section 2(b).

"<u>Payor</u>" has the meaning specified in the preamble of this Agreement.

"<u>Payor Affiliate</u>" means any Affiliate of the Payor other than the Payee and any Payee Subsidiary.

"<u>Payor Material Adverse Effect</u>" means (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and the Payor Subsidiaries, taken as a whole, (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement, or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"<u>Payor Subsidiaries</u>" means any Subsidiaries of Payor other than Payee and any Payee Subsidiary.

"<u>Permitted Use</u>" means each of the following: (i) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including, without limitation, the payment of any

indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no Bankruptcy Case pending; (ii) the payment of any and all (a) administrative expenses incurred during the pendency of any Bankruptcy Case that have been allowed by an order of the Bankruptcy Court and (b) other costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in the judgment of the Payee's Board, collectively including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business during the pendency of the Bankruptcy Case (including, without limitation, the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee); (iii) the funding of any amounts necessary or appropriate in the judgment of Payee's Board to satisfy (a) Payee's Asbestos Related Liabilities and Environmental Liabilities established by one or more final and non-appealable judgments of a court of competent jurisdiction or final settlement thereof prior to the commencement of any Bankruptcy Case and any ancillary costs and expenses of the Payee associated with the pursuit of such Asbestos Related Claims or Environmental Claims; and (b) following the commencement of any Bankruptcy Case, (1) Payee's Asbestos Related Liabilities (A) in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee proposed or supported by the Payee (a "524(g) Plan") and confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court, which order or orders determine the aggregate amount of such Asbestos Related Liabilities on the basis of evidence in the record of the Bankruptcy Case (a "524(g) Confirmation Order") or (B) in connection with consummation of a plan of reorganization for the Payee proposed or supported by the Payee that does not provide for a trust under section 524(g) of the Bankruptcy Code (a "Non-524(g) Plan") that is confirmed by a final, nonappealable order of the Bankruptcy Court (a "Non 524(g) Confirmation Order"), which Asbestos Related Liabilities have been allowed by one or more final, nonappealable orders of the Bankruptcy Court or District Court pursuant to a formal claims allowance process established in the Bankruptcy Case in respect of such Asbestos Related Liabilities; (2) any Environmental Liabilities in amounts that are allowed or are deemed allowed under a Plan; (3) any other claims allowed or deemed allowed under a Plan that are not in respect of Asbestos-Related Liabilities or Environmental Liabilities; (iv) the funding of any amounts necessary to cause the Support Account to contain at least $5,000,000 at all times prior to the effective date of a Plan; (v) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including, without limitation, any indemnification or other obligations of the Payee under the Services Agreement and Merger Agreement; and (vi) any and all taxes incurred by Payee as a result of the Merger, Dividend and/or Assignment; in the case of clauses (i) through (vi) above, solely to the extent that any cash distributions theretofore received by the Payee from any Payee Subsidiary are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (iii)(b) above, solely to the extent that cash distributions from any Payee Subsidiary and Payee's other assets are collectively insufficient to fund amounts required by a Confirmation Order.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan" means a 524(g) Plan or a Non-524(g) Plan.

"Predecessor" has the meaning specified in the recitals of this Agreement.

"SEC" means the Securities and Exchange Commission.

"Services Agreement" means that certain Services Agreement between Payor and Payee (as it may be amended, restated, modified or supplemented from time to time).

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by another Person or by one or more other Subsidiaries of such Person.

5

"Support Account" means the account of the Payee listed on Schedule 3 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"Support Request" has the meaning specified in Section 2(b).

"USD" means United States dollars.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.     **Support Obligations and Procedures**.

(a)     Support Obligations.  The Payor hereby agrees, on the terms and conditions set forth in this Agreement, (1) to fund into the Support Account an initial sum of twenty million USD ($20,000,000) in cash on or before January 3, 2020, subject to mutual extension thereof (the "Initial Payment"), in addition to any amounts funded into the Support Account pursuant to any other agreement and (2) upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment") in an amount, together with all prior Payments, not to exceed the Payment Cap, the proceeds of which shall be used by the Payee for any Permitted Use.  Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the lesser of (i) the Payment Cap and (ii) the aggregate amount necessary for the Payee to fund all Permitted Uses, and nothing in this Agreement shall obligate the Payor to make any individual Payment under this Agreement that exceeds the amount necessary for the Payee to fund the Payee's projected Permitted Uses over the 30 days following the date of such Payment.

(b)     Support Requests.  To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment substantially in the form attached as Exhibit A hereto and signed by the Payee (each, a "Support Request").  Each Support Request shall specify (i) the amount of the requested Payment, which shall be no less than $1,000,000, and (ii) the date requested for such Payment, which shall be no earlier than the date that is three Business Days following the delivery of such Support Request (each such date, a "Payment Date").  Each Support Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied and that there shall have been no uncured violation by the Payee of the covenants set forth in Section 5.

(c)     Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on any Payment Date, the Payor shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Support Request.  All Payments shall be made by wire or other transfer of immediately available funds, in USD, to the Support Account.  In the event that the Payor does not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made, and the Payor shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d)     Conditions to Payments.  The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Support Request relating to such Payment: (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no uncured violation by the Payee of the covenants set forth in Section 5.

3.      **Representations and Warranties**.

(a)      <u>Representations and Warranties of the Payor</u>.  The Payor represents and warrants to the Payee that:

(i)      <u>Existence, Qualification and Power</u>.  The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii)      <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law, except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii)      <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery, or performance of this Agreement by, or enforcement against, the Payor.

(iv)      <u>Binding Effect</u>.  This Agreement has been duly executed and delivered by the Payor.  This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)      <u>Representations and Warranties of the Payee</u>.  The Payee represents and warrants to the Payor that:

(i)      <u>Existence, Qualification and Power</u>.  The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

7

(ii)    Authorization; No Contravention.  The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law, except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)    Governmental Authorization; Other Consents.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery, or performance of this Agreement by, or enforcement against, the Payee.

(iv)    Binding Effect.  This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.    **Covenants of the Payor**.

(a)    Provision of Financial Information.

(i)    The Payor will have (i) its annual financial statements audited by the Payor's independent registered public accountants and will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and (ii) unaudited quarterly financial statements (other than the last fiscal quarter of each fiscal year) provided to Payee no later than 45 days after the end of such fiscal quarter.  The unaudited quarterly and audited annual consolidated financial statements shall be prepared in accordance with GAAP subject, with respect to quarterly financial statements, to the absence of footnote disclosure and normal year-end audit adjustments.

(ii)    By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate any such information not publicly disclosed by the Payor to any Person, including, without limitation, in any aggregated or converted form, and will keep such information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof).

(iii)    Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute the financial information required by Section 4(a)(i) by filing the information with the SEC within the applicable time periods specified in the SEC's rules and regulations, including any applicable grace period or extension.  The Payor will be deemed to have satisfied the reporting requirements of Section 4(a)(i) if it has filed such reports containing such information with the SEC within the applicable time periods specified in the SEC's rules and regulations, including any applicable grace period or extension, and such reports are publicly available.

(b)    Successor to the Payor upon Consolidation or Merger.

(i)        Subject to the provisions of Sections 4(b)(ii) and 4(b)(iii), nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including the equity interests of the Payor), to any Person; *provided*, *however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property.  This covenant will not apply to: (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States; (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state; or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state, so long as, in each case, the surviving entity by operation of law remains bound by the provisions of this Agreement.

(ii)        Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Payor (for the avoidance of doubt, calculated by including the equity interests of the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation into or with which the Payor is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein.  In the event of a succession in compliance with this Section 4(b)(ii), the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii)        Any consolidation, merger, sale, conveyance or lease referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default arising from any action or inaction by Payor shall have occurred and be continuing.

5.        **Covenants of the Payee**.

(a)        The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Use; and

(b)        The Payee will perform its indemnification obligations under the Merger Agreement in all material respects.

6.      **Events of Default**.  Each of the following events constitutes an "<u>Event of Default</u>":

(a)      The Payee defaults in the performance of, or breaches, any covenant or representation or warranty of the Payee in this Agreement and such default or breach continues for a period of five (5) Business Days after there has been given to the Payee by the Payor a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "<u>Notice of Default</u>" hereunder;

(b)      the Payor defaults in its funding obligations pursuant to Section 2 and such default continues for a period of five (5) Business Days;

(c)      the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of 90 days, or, in the case of any failure to comply with Section 4(a) of this Agreement, 180 days, in each case after there has been given to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "<u>Notice of Default</u>" hereunder;

(d)      the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(e)      a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor in the nature of an exercise of jurisdiction over all or the majority of Payor's assets, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor or the Payee, as applicable, shall promptly deliver to the Payee or Payor, as applicable, a written statement specifying such Default or Event of Default.

7.      **Remedies**.  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the non-defaulting Party may continue to enforce the performance of any provision of this Agreement, as applicable, and the Payee, if a non-defaulting Party may pursue any available remedy to collect any unfunded Payments due and owing to the Payee.

8.      **Notices**.  All notices required under this Agreement, including each Support Request and any approval of or objection to a Support Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

<u>Payor</u>:

O-I Glass, Inc.
One Michael Owens Way, Plaza 1
Perrysburg, OH 43551-2999
Email: Anand.Patel@o-i.com

Corp.tr@o-i.com

<u>Payee</u>:

Paddock Enterprises, LLC
One Michael Owens Way, Plaza 1
Perrysburg, OH 43551-2999
Email: dgordon@djoservicesllc.com

9.       **Governing Law; Jury Trial Waiver**.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without regard to principles of conflict of law that would defer to the laws of another jurisdiction.  **PAYOR AND PAYEE AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF THE PARTIES HERETO WITH RESPECT TO ANY MATTER RELATING TO OR ARISING OUT OF THE ENGAGEMENT OR THE PERFORMANCE OR NON-PERFORMANCE OF THE PARTIES HEREUNDER.**  Payor and Payee agree, to the extent permitted by applicable law, (a) that any federal court sitting within the District of Delaware shall have exclusive jurisdiction over any litigation arising out of this Agreement; (b) to submit to the personal jurisdiction of the Courts of the United States District Court for the District of Delaware; (c) to waive any and all personal rights under the law of any jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to jurisdiction or venue within the State of Delaware for any litigation arising in connection with this Agreement; and (d) in the event that the Payee commences a Bankruptcy Case, that (1) the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement and that each of the Parties hereby consents to entry by the Bankruptcy Court of a final order in any dispute arising out of or related to this Agreement and (2) Payor shall be entitled to participate and be heard in any matters implicating, in any way, the scope, extent, timing, or enforceability of, or obligations under, this Agreement.

10.     **No Implied Waiver; Amendments**.  No failure or delay on the part of the Payee or Payor to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payor or the Payee in any case shall entitle the other Party to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee or the Payor therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.     **Counterparts; Entire Agreement; Electronic Execution**.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, any prior written or oral agreement between the Parties on the subject matter herein.  This Agreement shall become effective when it shall have been executed by each party hereto and each party shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed

11

counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.     **Severability**.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law and are consistent with the Parties' intentions with respect to the applicable invalid, illegal or unenforceable provisions.

13.     **Transfer; Assignment**.   This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee, which may be withheld in its sole and absolute discretion; provided, however, that no such consent of the Payee shall be required in connection with any transfer effected in compliance with Section 4(b).  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor, which may be withheld in its sole and absolute discretion.

14.     **Rights of Parties**.  This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

*[Signature pages follow]*

12

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**O-I GLASS, INC.**, a Delaware corporation, as the Payor

By:_____

Name: Mary Beth Wilkinson
Title: Senior Vice President, General Counsel and
      Corporate Secretary

**PADDOCK ENTERPRISES, LLC**, a Delaware limited liability company, as the Payee

By:_____

Name: John Haudrich
Title: Treasurer and Chief Financial Officer

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**O-I GLASS, INC.**, a Delaware corporation, as the Payor

By:_____
Name:  MaryBeth Wilkinson
Title: Senior Vice President, General Counsel and
        Corporate Secretary

**PADDOCK ENTERPRISES, LLC**, a Delaware limited liability company, as the Payee

By:_____
Name: John Haudrich
Title: Treasurer and Chief Financial Officer

EXECUTION VERSION

## SCHEDULE 1

### Definition of Asbestos Related Liabilities

For purposes of this Agreement, "Asbestos Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a)     "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative, or regulatory authority, agency, court, arbitration tribunal, board, department, commission or other governmental, or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)     "Law" means any federal, state, local, municipal or foreign statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law), of any Governmental Authority, and includes rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)     "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including those arising or that may arise under any past, present, or future Law or Contract or pursuant to any Cause of Action or Proceeding, including all claims for economic or noneconomic damages or injuries of any type or nature whatsoever including claims for physical, mental, and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium, wrongful death as well as claims for damage to property and/or punitive damages.

(f)     "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)     "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union, or other entity, association or Governmental Authority.

(h)     "Plan" means, with respect to any Person, (a) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (b) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code and (c) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention,

deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering such Person.

(i)    "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

EXECUTION VERSION

**SCHEDULE 2**

**Definition of Environmental Liabilities**

For purposes of this Agreement, "Environmental Liabilities" means all Liabilities (as defined below) of the Payee arising under or related to any Environmental Laws (as defined below); provided, for the avoidance of doubt, that Environmental Liabilities shall exclude any Asbestos Related Liabilities (as defined in Schedule 1).

Capitalized terms that are used in this Schedule 2 have the following meanings:

(a)     "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "Environmental Law" means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, et seq., (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, et seq., (c) the Clean Air Act, 42 U.S.C. §§ 7401, et seq., (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, et seq., (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq., (f) all statutes, laws, rules, permits or regulations issued or promulgated by any Governmental Authority or court (including the common law), as they may be amended from time to time, relating to the protection and/or prevention of harm, contamination or pollution of or to the environment (including ecological systems and living organisms including humans and the following media whether alone or in combination: air (including air within buildings), water (including water under or within land or in pipe or sewage systems), land, buildings and soil) and (g) ordinances, rules, regulations, orders, notices of violation, requests, demands, permits and requirements issued or promulgated by any Governmental Authority in connection with such statutes or laws.

(d)     "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative, or regulatory authority, agency, court, arbitration tribunal, board, department, commission or other governmental, or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(e)     "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including those arising or that may arise under any past, present, or future Environmental Law or Contract or pursuant to any Cause of Action or Proceeding.

(f)     "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)     "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing,

inquiry, interference, investigation, litigation, mediation, opposition, re-examination, summons, subpoena or suit or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

US-DOCS\111457162

EXECUTION VERSION

**SCHEDULE 3**

**Support Account**

[TO BE PROVIDED]

EXECUTION VERSION

## **EXHIBIT A**

FORM OF SUPPORT REQUEST

**Paddock Enterprises, LLC**
**One Michael Owens Way, Plaza 1**
**Perrysburg, OH 43551-2999**

[Date]

O-I Glass, Inc.
One Michael Owens Way, Plaza 1
Perrysburg, OH 43551-2999

Re:  Support Request for Paddock Enterprises, LLC (this "**Support Request Letter**")

Ladies and Gentlemen:

Reference is hereby made to the Support Agreement, dated as of December 27, 2019 (as it may be amended, restated, modified or supplemented from time to time, the "**Support Agreement**"), by and between O-I Glass, Inc., a Delaware corporation ("**Payor**"), and Paddock Enterprises, LLC, a Delaware limited liability company ("**Payee**").  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Support Agreement.

This Support Request Letter is executed and delivered by Payee to Payor pursuant to Section 2(b) of the Support Agreement.  Payee hereby requests a Payment from Payor pursuant to the Support Agreement in the amount of $[amount] to be made on [date].  Payee hereby instructs Payor to disburse on the date of the Payment requested herein, the proceeds of the Payment to the Support Account.

In connection with the Payment requested herein, Payee hereby represents, warrants and certifies to Payor that:

    i.        proceeds from the Payment shall be used to fund Payee's projected Permitted Uses over the 30 days following the date of the Payment;

    ii.       the representations and warranties of Payee set forth in Section 3(b) of the Support Agreement are true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and

    iii.      there are no uncured violations by Payee of the covenants set forth in Section 5 of the Support Agreement.

*[Signature page follows]*

Exhibit A-2

EXECUTION VERSION

The undersigned hereby certifies each and every matter contained herein to be true and correct.


**PADDOCK ENTERPRISES, LLC**, a Delaware
limited liability company, as the Payee


By:_____
Name:
Title: