**<u>EXHIBIT B</u>**

**SUPPORT AGREEMENT**

EXECUTION VERSION

## SUPPORT AGREEMENT

This SUPPORT AGREEMENT, dated as of December 27, 2019 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement"), is between O-I Glass, Inc., a Delaware corporation ("Payor"), and Paddock Enterprises, LLC, a Delaware limited liability company ("Payee").

## RECITALS

A.     The predecessor of Payee (the "Predecessor") has received thousands of claims from individuals alleging bodily injury and death as a result of exposure to asbestos from a product manufactured by the Predecessor between 1948 and 1958.  Payee is currently a defendant in approximately 900 lawsuits alleging such claims, and expects to continue to receive such claims, both informally and through additional lawsuits.  As a result, Payee has considered seeking relief under the Bankruptcy Code (as defined below) for the purpose of confirming a Plan (as defined below).

B.     Payor is the sole member of Payee and Payee is intended to be treated as an entity disregarded as separate from Payor solely for U.S. federal tax and applicable state and local tax purposes.

C.     On December 25, 2019, the Board of Payor approved (1) execution and delivery of the Assignment and Assumption Agreement; and (2) execution and delivery of this Agreement.

D.     On December 26, 2019, the Board of Payee approved (1) a dividend resulting in the distribution of all equity shares in Owens-Illinois Group, Inc. ("O-I Group"), a Delaware corporation and wholly-owned subsidiary of Payee, to Payor (the "Dividend"); (2) execution and delivery of the Assumption and Assignment Agreement (as defined below) (the "Assignment"); and (3) execution and delivery of this Agreement.

E.     On December 26, 2019, effective immediately after the effective time of the Merger, the Assignment became effective.

F.     On the date hereof, effective as of 7 a.m. prevailing Eastern Time (the "Dividend Effective Time"), all shares of O-I Group will be distributed to Payor, in its capacity as sole member of Payee, and Payee will retain all other assets it holds as of the Dividend Effective Time.

G.     In connection with, and effective just prior to the Dividend Effective Time (the "Agreement Effective Time"), Payor has agreed, pursuant to the terms of this Agreement, to provide support to Payee sufficient to pay the costs of operating Payee's business, as well as to satisfy all other liabilities of Payee specified herein (the "Covered Liabilities") on the terms set forth herein, such that, at and following the Dividend Effective Time, Payee has and will have assets having a value greater than its liabilities and will have financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities (as defined below) and Environmental Liabilities (as defined below).

## AGREEMENT

In consideration of the foregoing, the parties hereto agree as follows:

1.     **Definitions**.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"524(g) Confirmation Order" has the meaning set forth in the definition of "Permitted Use".

"524(g) Plan" has the meaning set forth in the definition of "Permitted Use".

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Agreement" has the meaning specified in the preamble of this Agreement.

"Asbestos Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Assignment" has the meaning specified in the recitals to this Agreement.

"Assumption and Assignment Agreement" means that certain Assumption and Assignment Agreement dated as of December 26, 2019 between Payor and Payee.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of: (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit; and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Wilmington, Delaware or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

US-DOCS\111457162

"Confirmation Order" means either a 524(g) Confirmation Order or a Non-524(g) Confirmation Order.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"Covered Liabilities" has the meaning specified in the recitals to this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Dividend" has the meaning specified in the recitals to this Agreement.

"Dividend Effective Time" has the meaning specified in the recitals to this Agreement.

"Environmental Liabilities" has the meaning set forth in Schedule 2 to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.  If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Initial Payment" has the meaning specified in Section 2(a).

"Merger" means the merger of Owens-Illinois, Inc. with and into Payee pursuant to the terms of the Merger Agreement.

3

"Merger Agreement" means that certain Agreement and Plan of Merger dated as of December 26, 2019 by and among Owens-Illinois, Inc., a Delaware corporation, Payor, and Payee (as it may be amended, restated, modified or supplemented from time to time).

"Non 524(g) Confirmation Order" has the meaning set forth in the definition of "Permitted Use".

"Non 524(g) Plan" has the meaning set forth in the definition of "Permitted Use".

"O-I Group" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means, (a) with respect to any corporation, its certificate or articles of incorporation and bylaws, (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement, and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Payee" has the meaning specified in the preamble of this Agreement.

"Payee Material Adverse Effect" means (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement, or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payee Subsidiary" means any wholly-owned Subsidiary of the Payee and for avoidance of doubt shall exclude the Payor and the Payor Affiliates.

"Payment" has the meaning specified in Section 2(a).

"Payment Cap" means the sum of (x) the fair market value of the equity shares in O-I Group subject to the Dividend and (y) the net value of assets, if any, subject to the Assignment.

"Payment Date" has the meaning specified in Section 2(b).

"Payor" has the meaning specified in the preamble of this Agreement.

"Payor Affiliate" means any Affiliate of the Payor other than the Payee and any Payee Subsidiary.

"Payor Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and the Payor Subsidiaries, taken as a whole, (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement, or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Payor Subsidiaries" means any Subsidiaries of Payor other than Payee and any Payee Subsidiary.

"Permitted Use" means each of the following: (i) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including, without limitation, the payment of any

indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no Bankruptcy Case pending; (ii) the payment of any and all (a) administrative expenses incurred during the pendency of any Bankruptcy Case that have been allowed by an order of the Bankruptcy Court and (b) other costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in the judgment of the Payee's Board, collectively including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business during the pendency of the Bankruptcy Case (including, without limitation, the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee); (iii) the funding of any amounts necessary or appropriate in the judgment of Payee's Board to satisfy (a) Payee's Asbestos Related Liabilities and Environmental Liabilities established by one or more final and non-appealable judgments of a court of competent jurisdiction or final settlement thereof prior to the commencement of any Bankruptcy Case and any ancillary costs and expenses of the Payee associated with the pursuit of such Asbestos Related Claims or Environmental Claims; and (b) following the commencement of any Bankruptcy Case, (1) Payee's Asbestos Related Liabilities (A) in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee proposed or supported by the Payee (a "524(g) Plan") and confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court, which order or orders determine the aggregate amount of such Asbestos Related Liabilities on the basis of evidence in the record of the Bankruptcy Case (a "524(g) Confirmation Order") or (B) in connection with consummation of a plan of reorganization for the Payee proposed or supported by the Payee that does not provide for a trust under section 524(g) of the Bankruptcy Code (a "Non-524(g) Plan") that is confirmed by a final, nonappealable order of the Bankruptcy Court (a "Non 524(g) Confirmation Order"), which Asbestos Related Liabilities have been allowed by one or more final, nonappealable orders of the Bankruptcy Court or District Court pursuant to a formal claims allowance process established in the Bankruptcy Case in respect of such Asbestos Related Liabilities; (2) any Environmental Liabilities in amounts that are allowed or are deemed allowed under a Plan; (3) any other claims allowed or deemed allowed under a Plan that are not in respect of Asbestos-Related Liabilities or Environmental Liabilities; (iv) the funding of any amounts necessary to cause the Support Account to contain at least $5,000,000 at all times prior to the effective date of a Plan; (v) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including, without limitation, any indemnification or other obligations of the Payee under the Services Agreement and Merger Agreement; and (vi) any and all taxes incurred by Payee as a result of the Merger, Dividend and/or Assignment; in the case of clauses (i) through (vi) above, solely to the extent that any cash distributions theretofore received by the Payee from any Payee Subsidiary are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (iii)(b) above, solely to the extent that cash distributions from any Payee Subsidiary and Payee's other assets are collectively insufficient to fund amounts required by a Confirmation Order.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan" means a 524(g) Plan or a Non-524(g) Plan.

"Predecessor" has the meaning specified in the recitals of this Agreement.

"SEC" means the Securities and Exchange Commission.

"Services Agreement" means that certain Services Agreement between Payor and Payee (as it may be amended, restated, modified or supplemented from time to time).

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by another Person or by one or more other Subsidiaries of such Person.

5

"Support Account" means the account of the Payee listed on Schedule 3 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"Support Request" has the meaning specified in Section 2(b).

"USD" means United States dollars.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.    **Support Obligations and Procedures**.

(a)    Support Obligations.  The Payor hereby agrees, on the terms and conditions set forth in this Agreement, (1) to fund into the Support Account an initial sum of twenty million USD ($20,000,000) in cash on or before January 3, 2020, subject to mutual extension thereof (the "Initial Payment"), in addition to any amounts funded into the Support Account pursuant to any other agreement and (2) upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment") in an amount, together with all prior Payments, not to exceed the Payment Cap, the proceeds of which shall be used by the Payee for any Permitted Use.  Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the lesser of (i) the Payment Cap and (ii) the aggregate amount necessary for the Payee to fund all Permitted Uses, and nothing in this Agreement shall obligate the Payor to make any individual Payment under this Agreement that exceeds the amount necessary for the Payee to fund the Payee's projected Permitted Uses over the 30 days following the date of such Payment.

(b)    Support Requests.  To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment substantially in the form attached as Exhibit A hereto and signed by the Payee (each, a "Support Request").  Each Support Request shall specify (i) the amount of the requested Payment, which shall be no less than $1,000,000, and (ii) the date requested for such Payment, which shall be no earlier than the date that is three Business Days following the delivery of Support Request (each such date, a "Payment Date").  Each Support Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied and that there shall have been no uncured violation by the Payee of the covenants set forth in Section 5.

(c)    Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on any Payment Date, the Payor shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Support Request.  All Payments shall be made by wire or other transfer of immediately available funds, in USD, to the Support Account.  In the event that the Payor does not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made, and the Payor shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d)    Conditions to Payments.  The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Support Request relating to such Payment: (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no uncured violation by the Payee of the covenants set forth in Section 5.

6

3.      **Representations and Warranties**.

(a)      <u>Representations and Warranties of the Payor</u>.  The Payor represents and warrants to the Payee that:

(i)      <u>Existence, Qualification and Power</u>.  The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii)      <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law, except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii)      <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery, or performance of this Agreement by, or enforcement against, the Payor.

(iv)      <u>Binding Effect</u>.  This Agreement has been duly executed and delivered by the Payor.  This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)      <u>Representations and Warranties of the Payee</u>.  The Payee represents and warrants to the Payor that:

(i)      <u>Existence, Qualification and Power</u>.  The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

7

(ii)    <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law, except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)    <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery, or performance of this Agreement by, or enforcement against, the Payee.

(iv)    <u>Binding Effect</u>.  This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.    **Covenants of the Payor**.

(a)    <u>Provision of Financial Information</u>.

(i)    The Payor will have (i) its annual financial statements audited by the Payor's independent registered public accountants and will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and (ii) unaudited quarterly financial statements (other than the last fiscal quarter of each fiscal year) provided to Payee no later than 45 days after the end of such fiscal quarter.  The unaudited quarterly and audited annual consolidated financial statements shall be prepared in accordance with GAAP subject, with respect to quarterly financial statements, to the absence of footnote disclosure and normal year-end audit adjustments.

(ii)    By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate any such information not publicly disclosed by the Payor to any Person, including, without limitation, in any aggregated or converted form, and will keep such information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof).

(iii)    Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute the financial information required by Section 4(a)(i) by filing the information with the SEC within the applicable time periods specified in the SEC's rules and regulations, including any applicable grace period or extension.  The Payor will be deemed to have satisfied the reporting requirements of Section 4(a)(i) if it has filed such reports containing such information with the SEC within the applicable time periods specified in the SEC's rules and regulations, including any applicable grace period or extension, and such reports are publicly available.

(b)    <u>Successor to the Payor upon Consolidation or Merger</u>.

US-DOCS\111457162

(i)        Subject to the provisions of Sections 4(b)(ii) and 4(b)(iii), nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including the equity interests of the Payor), to any Person; *provided*, *however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property.  This covenant will not apply to: (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States; (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state; or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state, so long as, in each case, the surviving entity by operation of law remains bound by the provisions of this Agreement.

(ii)        Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Payor (for the avoidance of doubt, calculated by including the equity interests of the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation into or with which the Payor is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein.  In the event of a succession in compliance with this Section 4(b)(ii), the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii)        Any consolidation, merger, sale, conveyance or lease referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default arising from any action or inaction by Payor shall have occurred and be continuing.

5.        **Covenants of the Payee**.

(a)        The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Use; and

(b)        The Payee will perform its indemnification obligations under the Merger Agreement in all material respects.

9

6.      **Events of Default**.  Each of the following events constitutes an "<u>Event of Default</u>":

(a)      The Payee defaults in the performance of, or breaches, any covenant or representation or warranty of the Payee in this Agreement and such default or breach continues for a period of five (5) Business Days after there has been given to the Payee by the Payor a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "<u>Notice of Default</u>" hereunder;

(b)      the Payor defaults in its funding obligations pursuant to Section 2 and such default continues for a period of five (5) Business Days;

(c)      the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of 90 days, or, in the case of any failure to comply with Section 4(a) of this Agreement, 180 days, in each case after there has been given to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "<u>Notice of Default</u>" hereunder;

(d)      the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(e)      a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor in the nature of an exercise of jurisdiction over all or the majority of Payor's assets, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor or the Payee, as applicable, shall promptly deliver to the Payee or Payor, as applicable, a written statement specifying such Default or Event of Default.

7.      **Remedies**.  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the non-defaulting Party may continue to enforce the performance of any provision of this Agreement, as applicable, and the Payee, if a non-defaulting Party may pursue any available remedy to collect any unfunded Payments due and owing to the Payee.

8.      **Notices**.  All notices required under this Agreement, including each Support Request and any approval of or objection to a Support Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

<u>Payor</u>:

O-I Glass, Inc.
One Michael Owens Way, Plaza 1
Perrysburg, OH 43551-2999
Email: Anand.Patel@o-i.com

Corp.tr@o-i.com

Payee:

Paddock Enterprises, LLC
One Michael Owens Way, Plaza 1
Perrysburg, OH 43551-2999
Email: dgordon@djoservicesllc.com

9.      **Governing Law; Jury Trial Waiver**.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without regard to principles of conflict of law that would defer to the laws of another jurisdiction.  **PAYOR AND PAYEE AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF THE PARTIES HERETO WITH RESPECT TO ANY MATTER RELATING TO OR ARISING OUT OF THE ENGAGEMENT OR THE PERFORMANCE OR NON-PERFORMANCE OF THE PARTIES HEREUNDER.**  Payor and Payee agree, to the extent permitted by applicable law, (a) that any federal court sitting within the District of Delaware shall have exclusive jurisdiction over any litigation arising out of this Agreement; (b) to submit to the personal jurisdiction of the Courts of the United States District Court for the District of Delaware; (c) to waive any and all personal rights under the law of any jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to jurisdiction or venue within the State of Delaware for any litigation arising in connection with this Agreement; and (d) in the event that the Payee commences a Bankruptcy Case, that (1) the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement and that each of the Parties hereby consents to entry by the Bankruptcy Court of a final order in any dispute arising out of or related to this Agreement and (2) Payor shall be entitled to participate and be heard in any matters implicating, in any way, the scope, extent, timing, or enforceability of, or obligations under, this Agreement.

10.     **No Implied Waiver; Amendments**.  No failure or delay on the part of the Payee or Payor to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payor or the Payee in any case shall entitle the other Party to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee or the Payor therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.     **Counterparts; Entire Agreement; Electronic Execution**.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, any prior written or oral agreement between the Parties on the subject matter herein.  This Agreement shall become effective when it shall have been executed by each party hereto and each party shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed

11

counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.    **Severability**.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law and are consistent with the Parties' intentions with respect to the applicable invalid, illegal or unenforceable provisions.

13.    **Transfer; Assignment**.  This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee, which may be withheld in its sole and absolute discretion; provided, however, that no such consent of the Payee shall be required in connection with any transfer effected in compliance with Section 4(b).  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor, which may be withheld in its sole and absolute discretion.

14.    **Rights of Parties**.  This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

*[Signature pages follow]*

12

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**O-I GLASS, INC.**, a Delaware corporation, as the Payor

By:_____

Name: Mary Beth Wilkinson
Title: Senior Vice President, General Counsel and
      Corporate Secretary

**PADDOCK ENTERPRISES, LLC**, a Delaware limited liability company, as the Payee

By:_____

Name: John Haudrich
Title: Treasurer and Chief Financial Officer

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**O-I GLASS, INC.**, a Delaware corporation, as the Payor

By:_____
Name:  MaryBeth Wilkinson
Title: Senior Vice President, General Counsel and
       Corporate Secretary

**PADDOCK ENTERPRISES, LLC**, a Delaware limited liability company, as the Payee

By:_____
Name: John Haudrich
Title: Treasurer and Chief Financial Officer

EXECUTION VERSION

## SCHEDULE 1

### Definition of Asbestos Related Liabilities

For purposes of this Agreement, "Asbestos Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a) "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b) "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c) "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative, or regulatory authority, agency, court, arbitration tribunal, board, department, commission or other governmental, or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d) "Law" means any federal, state, local, municipal or foreign statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law), of any Governmental Authority, and includes rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e) "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including those arising or that may arise under any past, present, or future Law or Contract or pursuant to any Cause of Action or Proceeding, including all claims for economic or noneconomic damages or injuries of any type or nature whatsoever including claims for physical, mental, and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium, wrongful death as well as claims for damage to property and/or punitive damages.

(f) "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g) "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union, or other entity, association or Governmental Authority.

(h) "Plan" means, with respect to any Person, (a) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (b) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code and (c) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention,

deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering such Person.

(i)     "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

US-DOCS\111457162

EXECUTION VERSION

# SCHEDULE 2

## Definition of Environmental Liabilities

For purposes of this Agreement, "Environmental Liabilities" means all Liabilities (as defined below) of the Payee arising under or related to any Environmental Laws (as defined below); provided, for the avoidance of doubt, that Environmental Liabilities shall exclude any Asbestos Related Liabilities (as defined in Schedule 1).

Capitalized terms that are used in this Schedule 2 have the following meanings:

(a)     "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "Environmental Law" means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, et seq., (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, et seq., (c) the Clean Air Act, 42 U.S.C. §§ 7401, et seq., (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, et seq., (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq., (f) all statutes, laws, rules, permits or regulations issued or promulgated by any Governmental Authority or court (including the common law), as they may be amended from time to time, relating to the protection and/or prevention of harm, contamination or pollution of or to the environment (including ecological systems and living organisms including humans and the following media whether alone or in combination: air (including air within buildings), water (including water under or within land or in pipe or sewage systems), land, buildings and soil) and (g) ordinances, rules, regulations, orders, notices of violation, requests, demands, permits and requirements issued or promulgated by any Governmental Authority in connection with such statutes or laws.

(d)     "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative, or regulatory authority, agency, court, arbitration tribunal, board, department, commission or other governmental, or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(e)     "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including those arising or that may arise under any past, present, or future Environmental Law or Contract or pursuant to any Cause of Action or Proceeding.

(f)     "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)     "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing,

inquiry, interference, investigation, litigation, mediation, opposition, re-examination, summons, subpoena or suit or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

**SCHEDULE 3**

**Support Account**

[TO BE PROVIDED]

EXECUTION VERSION

## **EXHIBIT A**

FORM OF SUPPORT REQUEST

EXECUTION VERSION

**Paddock Enterprises, LLC**
**One Michael Owens Way, Plaza 1**
**Perrysburg, OH 43551-2999**

[Date]

O-I Glass, Inc.
One Michael Owens Way, Plaza 1
Perrysburg, OH 43551-2999

Re:  Support Request for Paddock Enterprises, LLC (this "**Support Request Letter**")

Ladies and Gentlemen:

Reference is hereby made to the Support Agreement, dated as of December 27, 2019 (as it may be amended, restated, modified or supplemented from time to time, the "**Support Agreement**"), by and between O-I Glass, Inc., a Delaware corporation ("**Payor**"), and Paddock Enterprises, LLC, a Delaware limited liability company ("**Payee**").  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Support Agreement.

This Support Request Letter is executed and delivered by Payee to Payor pursuant to Section 2(b) of the Support Agreement.  Payee hereby requests a Payment from Payor pursuant to the Support Agreement in the amount of $[amount] to be made on [date].  Payee hereby instructs Payor to disburse on the date of the Payment requested herein, the proceeds of the Payment to the Support Account.

In connection with the Payment requested herein, Payee hereby represents, warrants and certifies to Payor that:

    i.        proceeds from the Payment shall be used to fund Payee's projected Permitted Uses over the 30 days following the date of the Payment;

    ii.       the representations and warranties of Payee set forth in Section 3(b) of the Support Agreement are true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and

    iii.      there are no uncured violations by Payee of the covenants set forth in Section 5 of the Support Agreement.

*[Signature page follows]*

Exhibit A-2

The undersigned hereby certifies each and every matter contained herein to be true and correct.


**PADDOCK ENTERPRISES, LLC**, a Delaware
limited liability company, as the Payee


By: _____
Name:
Title: