# EXHIBIT C

## SERVICES AGREEMENT

EXECUTION VERSION

## SERVICES AGREEMENT

This Services Agreement (this "<u>Agreement</u>") is dated as of December 27, 2019 (the "<u>Effective Date</u>"), by and between **O-I GLASS, INC.**, a Delaware corporation ("<u>O-I Glass</u>" and, together with its subsidiaries other than Paddock (as defined below) and its subsidiaries, the "<u>Service Provider</u>"), and **PADDOCK ENTERPRISES, LLC**, a Delaware limited liability company ("<u>Paddock</u>" and, together with its subsidiaries, the "<u>Service Recipient</u>"), for Service Provider to provide Service Recipient one or more of the services set forth on <u>Exhibit A</u> as requested by Service Recipient (the "<u>Services</u>").

### RECITALS

A.    Service Provider desires to provide or otherwise make available to Service Recipient, and Service Recipient desires to receive from Service Provider, certain services as set forth on <u>Exhibit A</u>.

B.    Service Recipient acknowledges that Service Provider does not provide the Services to non-affiliated third parties, but is willing to provide or otherwise make available the Services to the Services Recipient, and Service Recipient is willing to accept the Services, on the terms hereof and strictly in consideration of their status as affiliated entities.

C.    Wherever in this Agreement the term "Service Provider" is used with respect to the provision of Services, it shall mean that O-I Glass shall provide, or shall cause another Service Provider to provide, the Services, and wherever in this Agreement the term "Service Recipient" is used with respect to the Services, it shall mean that Paddock shall be the recipient of such Services or shall designate one or more of the other Service Recipients as a recipient of the Services.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the premises and mutual agreements in this Agreement, the parties hereto hereby agree as follows:

1.    **SERVICES, TERM AND TERMINATION**.

a.    <u>Services and Term</u>.  Service Provider will provide to Service Recipient the Services from the Effective Date until such Services are terminated in accordance with <u>Section 1(b)</u> or <u>Section 9</u>.  The initial list of Services to be provided by Service Provider to Service Recipient includes all Services set forth on <u>Exhibit A</u>.  Paddock expressly acknowledges and agrees that O-I Glass's obligations hereunder to provide the Services may be satisfied by a Service Provider other than O-I Glass, subject to the other terms and conditions of this Agreement.

b.    <u>Termination of Service</u>.  Until this Agreement has been terminated under <u>Section 9</u>, either O-I Glass or Paddock may terminate one or more of the Services identified on <u>Exhibit A</u> by providing no less than 180 days written notice to the other party.  At such time as all Services have been terminated under this <u>Section 1(b)</u>, this Agreement will automatically terminate without notice and without any other action by any party.

**2.     SERVICES FEE**.  In consideration for each of the Services, Paddock agrees to pay O-I Glass amounts determined (including any interest payable thereon or taxes related thereto) and invoiced, in each case, as set forth on Exhibit B to this Agreement (the "Service Fees") with respect to each Service.

**3.     SERVICES**.

a.     O-I Glass's Obligations.  O-I Glass will use reasonable commercial efforts to perform its obligations under this Agreement and Exhibit A and will provide (or will cause one or more other Service Providers to provide) the Services in accordance with the policies and normal and ordinary procedures and practices of O-I Glass to the extent such policies, procedures and practices do not contradict this Agreement or Exhibit A.  Unless otherwise indicated in Exhibit A, any service metrics set forth therein are aspirational and are not minimum performance standards.  In providing the Services, O-I Glass will use, and will cause other Service Providers to use, reasonable commercial efforts to (i) comply in all material respects with all Legal Requirements (as defined below) and (ii) not violate or infringe upon the rights of third parties, including property, contractual, employment, trade secrets, proprietary information and non-disclosure rights, or any trademark, copyright or patent rights.  O-I Glass may, in its sole discretion, engage or otherwise subcontract with third parties to assist with the performance of any Services on behalf of O-I Glass in satisfaction of its obligations under this Agreement and at no additional cost to Paddock.  "Legal Requirement" means any applicable federal, state, local, municipal, foreign, international or multinational constitution, law, regulation, ordinance, order, rule or treaty, or principle of common law.

b.     Paddock's Obligations.  Paddock will, and will cause other Service Recipients to, assist O-I Glass in timely accomplishing its obligations under this Agreement by using reasonable commercial efforts to (i) provide all necessary or reasonably requested documents, information, access to personnel, and other resources, (ii) provide timely decisions, approvals, and acceptances, and (iii) take such other reasonably requested actions necessary or appropriate for the efficient and effective provision of the Services.  Without limiting the generality of the foregoing, at any time Service Provider's employees are providing the Services at a facility or other property owned or leased by a Service Recipient, Paddock will, and will cause other Service Recipients to, provide at no cost to Service Provider, reasonable and suitable accommodations for such employee's provision of Services at such facility or other property.

**4.     EQUIPMENT**.  Except as set forth on Exhibit A or as is otherwise agreed in writing, Service Provider will provide (or obtain access to) all equipment and accessories (including computer servers, racks, and other equipment) reasonably required to perform the Services.  Any such equipment and accessories that is property of Service Provider will remain the property of Service Provider and will not be transferred to Service Recipient hereunder.

**5.     CHANGE REQUESTS AND AMENDMENTS**.  If O-I Glass or Paddock desire a change in the scope of the Services, the party requesting the change will submit a written request for change of Service (the "Change Request").  Within 30 days after receipt of the Change Request, O-I Glass and Paddock will negotiate in good faith regarding mutually acceptable changes in the

2

scope of the Services.  O-I Glass and Paddock may substitute one or more revised versions of Exhibit A as they mutually agree from time-to-time.

**6.     DISPUTE RESOLUTION**.

a.     Dispute Resolution.  Any dispute, controversy or claim, of any and every kind or type, whether based on contract, tort, statute, regulations, or otherwise, between the parties hereunder, arising out of, connected with, or relating in any way to this Agreement or the obligations of the parties hereunder, including any dispute as to the existence, validity, construction, interpretation, negotiation, performance, non-performance, breach, termination or enforceability of this Agreement (in each case, a "Dispute"), shall be resolved solely and exclusively in accordance with the confidential individual procedures specified in this Section 6.  The parties shall attempt in good faith to resolve any Dispute by mutual discussions within 30 days after the date that one party gives notice of such a Dispute in accordance with this Section 6.  If the Dispute is not resolved within such 30 day period, any party may refer the Dispute to the senior management of the parties for further consideration.  If the senior management of the parties cannot resolve the Dispute within 15 days after the Dispute is referred to them, or such longer period that may subsequently be agreed to in writing by the parties to the Dispute, the Dispute shall be finally settled by confidential individual arbitration (which may be initiated by either party following expiration of the immediately foregoing time period) administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  To the extent that any party hereto (including assignees of any party's rights or obligations under this Agreement) may be entitled, in any jurisdiction, to claim for itself or its revenues, assets or properties, immunity from service of process, from suit, from the jurisdiction of any court, from an interlocutory order or injunction or the enforcement of the same against its property in such court, from attachment prior to judgment, from attachment in aid of execution of an arbitral award or judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be attributed such immunity (whether claimed or not), each party hereto hereby irrevocably agrees not to claim, and hereby irrevocably waives, such immunity.  This agreement to arbitrate shall be binding upon the successors, assignees, representatives and any trustee or receiver of any party.

b.     No Interruption.  While pending, these dispute resolution procedures will not, in and of themselves, relieve either O-I Glass or Paddock from their respective duty to perform under this Agreement or delay or suspend the operation of the Services or payment for undisputed Services.

**7.     REPRESENTATIONS AND WARRANTIES**.

a.     Representations and Warranties.  O-I Glass and Paddock each represent and warrant to the other party that:

i.     it is duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it was organized;

   ii. it has the full power and authority to execute, deliver, and perform this Agreement; and

   iii. the execution, delivery and performance of this Agreement have been duly authorized by it.

 b. <u>No Other Warranties</u>.  THIS <u>SECTION 7</u> IS IN LIEU OF AND EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND.  SERVICE PROVIDER MAKES NO WARRANTIES RELATING TO THE SERVICES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**8. INDEMNIFICATION**

 a. <u>GENERAL INDEMNIFICATION</u>.

   i. O-I GLASS WILL DEFEND, INDEMNIFY AND HOLD HARMLESS PADDOCK, ITS SUBSIDIARIES AND ITS AND THEIR RESPECTIVE MANAGERS, DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS (COLLECTIVELY, THE "<u>PADDOCK INDEMNIFIED PARTIES</u>"), FROM AND AGAINST ALL CLAIMS, STRICT LIABILITY CLAIMS, DEMANDS, CAUSES OF ACTION, JUDGMENTS, LIABILITY AND ASSOCIATED COSTS AND EXPENSES, INCLUDING REASONABLE AND DOCUMENTED ATTORNEY'S FEES, ARISING FROM THE INDEMNIFIED ACTIONS (AS DEFINED BELOW).

   ii. PADDOCK WILL DEFEND, INDEMNIFY AND HOLD HARMLESS O-I GLASS, ITS SUBSIDIARIES AND ITS AND THEIR RESPECTIVE SHAREHOLDERS, PARTNERS, MEMBERS, MANAGERS, DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS (COLLECTIVELY, BUT EXCLUDING ANY PADDOCK INDEMNIFIED PARTY, THE "<u>GLASS INDEMNIFIED PARTIES</u>" AND, TOGETHER WITH THE PADDOCK INDEMNIFIED PARTIES, THE "<u>INDEMNIFIED PARTIES</u>") FROM AND AGAINST ALL CLAIMS, STRICT LIABILITY CLAIMS, DEMAND, CAUSES OF ACTION, JUDGMENTS, LIABILITY AND ASSOCIATED COSTS AND EXPENSES, INCLUDING REASONABLE AND DOCUMENTED ATTORNEY'S FEES, ARISING FROM THE INDEMNIFIED ACTIONS.

   iii. FOR PURPOSES OF THIS SECTION 8(A), (1) WHEN O-I GLASS OR PADDOCK IS THE INDEMNIFYING PARTY, SUCH PARTY SHALL BE REFERRED TO AS THE "<u>INDEMNITOR</u>" AND (2) THE "<u>INDEMNIFIED ACTIONS</u>" SHALL INCLUDE:

    (1) THE NEGLIGENCE OR OTHER LEGAL FAULT OF THE INDEMNITOR (OR, IN THE CASE OF O-I GLASS, OTHER SERVICE PROVIDERS) IN PERFORMING THIS AGREEMENT OR ANY SERVICES,

(2) THE NEGLIGENCE OR OTHER LEGAL FAULT OF THIRD PARTIES ENGAGED OR OTHERWISE SUBCONTRACTED BY O-I GLASS TO PROVIDE ANY SERVICES,

(3) THE MISREPRESENTATION OR BREACH OF THE REPRESENTATIONS AND WARRANTIES OF THE INDEMNITOR IN THIS AGREEMENT, OR

(4) NONCOMPLIANCE BY THE INDEMNITOR WITH ANY COVENANTS, AGREEMENT OR UNDERTAKINGS OF THE INDEMNITOR IN THIS AGREEMENT.

iv. <u>LIMITATIONS ON GENERAL INDEMNIFICATION</u>. THE INDEMNITY DESCRIBED IN <u>SECTIONS 8(A)(I)-(III)</u> ABOVE WILL APPLY NOTWITHSTANDING THE ACTIVE OR PASSIVE NEGLIGENCE OR GROSS NEGLIGENCE OF ONE OR MORE OF THE INDEMNIFIED PARTIES, BUT THE INDEMNITOR'S LIABILITY TO INDEMNIFY THE INDEMNIFIED PARTY WILL BE REDUCED PROPORTIONATELY TO THE EXTENT THAT AN ACT OR OMISSION OF THE INDEMNIFIED PARTY MAY HAVE CONTRIBUTED TO THE INDEMNIFIED PARTY'S CLAIMED LIABILITY OR LOSS. NO INDEMNIFIED PARTY WILL BE INDEMNIFIED FOR LOSS, LIABILITY, INJURY OR DAMAGE RESULTING FROM ITS SOLE NEGLIGENCE, FRAUD, OR WILLFUL MISCONDUCT. THE INDEMNIFICATION PROVIDED BY THE INDEMNITOR WILL BE ONLY FOR DAMAGES, COSTS AND EXPENSES NET OF ANY INSURANCE PROCEEDS RECEIVED BY THE INDEMNIFIED PARTY IN RESPECT OF THE DAMAGES CLAIMED. THE LIABILITY OF O-I GLASS FOR DAMAGES TO PADDOCK FOR ANY CAUSE OF ACTION, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT OR IN TORT, INCLUDING NEGLIGENCE OR GROSS NEGLIGENCE, WILL BE LIMITED TO THE PAYMENTS MADE UNDER THIS AGREEMENT FOR THE SPECIFIED SERVICE THAT CAUSED THE DAMAGE DURING THE PERIOD IN WHICH THE DAMAGE WAS INCURRED.

b. <u>WAIVER OF CONSEQUENTIAL DAMAGES</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR AT LAW OR IN EQUITY, NEITHER O-I GLASS NOR PADDOCK WILL BE LIABLE TO ANY INDEMNIFIED PARTY FOR PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, LOSS OF DATA, LOSS OF USE, BUSINESS INTERRUPTION, OR ANY OTHER LOSS) HOWEVER CAUSED, UNDER ANY THEORY OF LIABILITY, ARISING FROM OR RELATING TO ANY CLAIM MADE UNDER THIS AGREEMENT OR REGARDING THE PROVISION OF OR THE FAILURE TO PROVIDE GOODS OR SERVICES UNDER THIS AGREEMENT. THIS <u>SECTION 8(B)</u> WILL NOT, OF ITSELF, LIMIT THE OBLIGATIONS OF O-I GLASS OR PADDOCK WITH RESPECT TO PAYMENT OF DAMAGES OF ANY KIND INCLUDED IN AN AWARD OR SETTLEMENT OF A THIRD-PARTY CLAIM UNDER ANY INDEMNITY IN THIS AGREEMENT.

c. <u>CLAIMS PROCEDURE</u>. UPON THE REQUEST OF AN INDEMNIFIED PARTY, THE INDEMNITOR WILL DEFEND ANY SUIT ASSERTING A CLAIM COVERED BY THIS INDEMNITY AND WILL PAY ALL COSTS, INCLUDING REASONABLE LEGAL FEES, WHICH MAY BE INCURRED BY SUCH INDEMNIFIED PARTY IN ENFORCING THIS INDEMNITY. THE INDEMNITOR WILL NOT SETTLE ANY LITIGATION UNLESS THE SETTLEMENT INCLUDES AN UNCONDITIONAL RELEASE BY THE CLAIMANT OF THE INDEMNIFIED PARTY FROM ALL LIABILITY WITH RESPECT TO THE CLAIM, WHICH RELEASE IS SATISFACTORY TO THE INDEMNIFIED PARTY IN ITS REASONABLE DISCRETION. EACH INDEMNITY IN THIS AGREEMENT IS A CONTINUING OBLIGATION, SEPARATE AND INDEPENDENT OF THE OTHER OBLIGATIONS OF EACH OF O-I GLASS AND PADDOCK AND SURVIVES TERMINATION OF THIS AGREEMENT. AN INDEMNIFIED PARTY NEED NOT INCUR EXPENSE OR MAKE PAYMENT BEFORE ENFORCING AN INDEMNITY UNDER THIS AGREEMENT.

9. **EVENTS OF DEFAULT, REMEDIES, AND DIVESTITURE**.

a. <u>Event of Default</u>. An "<u>Event of Default</u>" with respect to any Service or Services will mean, with respect to O-I Glass or Paddock, whichever is alleged to have taken or been affected by any of the actions set forth below (the "<u>Defaulting Party</u>"):

i. the failure by Paddock to make when due any payment required under this Agreement for the Service or Services, if not remedied within 15 business days after written notice of the failure is given to the Defaulting Party pursuant to <u>Section 14</u> of this Agreement; or

ii. the breach of a covenant in this Agreement, including <u>Section 3</u>, related to and material to the Service or Services, if the breach is not excused by force majeure (as set forth in <u>Section 12</u>) or remedied within 20 business days after written notice is given to the Defaulting Party.

b. <u>Remedies Upon an Event of Default</u>. If an Event of Default occurs, the non-Defaulting Party at its election may (i) invoke the dispute resolution procedures in <u>Section 6</u>, (ii) terminate the Service or Services for which an Event of Default has occurred, or (iii) withhold any payments due for the Service or Services for which an Event of Default has occurred until the Event of Default is remedied.

c. <u>Automatic Termination Upon Divestiture</u>. In the event that O-I Glass or its successor no longer owns, directly or indirectly, a 100% interest in Paddock, this Agreement will automatically terminate without notice and without any other action by any party.

10. **RELATIONSHIP OF THE PARTIES**. Service Provider will perform the Services as an independent contractor of Service Recipient. This Agreement does not create, and will not be construed by any third parties to create, any agency, employer-employee, joint venture, or partnership relationship between Service Provider and Service Recipient. No officer, employee, agent, or independent contractor of Service Provider or Service Recipient will at any time be deemed an employee, representative, agent, or contractor of the other party solely because of this

6

Agreement. Except with the prior approval of the other party, neither O-I Glass nor Paddock will attempt to bind the other party to any agreement or borrow money in the name of the other party.

**11.    CONFIDENTIALITY AND PROPRIETARY RIGHTS**.

a.    <u>Confidential Information</u>. O-I Glass and Paddock each hereby acknowledge that it (in such case, a "<u>Disclosing Party</u>") is willing, in accordance with the terms contained in this <u>Section 11</u>, to disclose to the other party (in such case, a "<u>Receiving Party</u>"), on a non-exclusive basis, certain confidential and/or proprietary information relating to this Agreement, including, without limitation, contractual, operational and financial materials, and other documents and information pertaining to this Agreement (all such information actually disclosed by or on behalf of either party to the other, collectively, the "<u>Confidential Information</u>"). O-I Glass and Paddock each acknowledge and agree that all Confidential Information shall be kept confidential and shall not be disclosed by the Receiving Party to any person or entity not controlling, controlled by, or under common control with, the Receiving Party without the consent of the Disclosing Party, except as otherwise provided in this <u>Section 11</u>. O-I Glass and Paddock may each disclose Confidential Information to its accountants, attorneys and similar advisors bound by a duty of confidentiality. This <u>Section 11</u> will not apply to information that is currently or becomes: (i) publicly known or available in the absence of any improper or unlawful action on the part of the party receiving such information hereunder; or (ii) independently developed or known or available to the party receiving such information hereunder other than through a disclosure that would otherwise violate this <u>Section 11</u>. Notwithstanding the other provisions of this <u>Section 11</u>, a Receiving Party may disclose Confidential Information without the Disclosing Party's prior written consent to the extent such information is required to be disclosed under stock exchange regulations, by a governmental order, decree, regulation or rule, or under any other applicable Legal Requirement; provided, however, that the Receiving Party shall: (i) use reasonable efforts to give prompt written notice (email being sufficient) to the Disclosing Party prior to such disclosure, (ii) only disclose that portion of the Confidential Information that is required to be disclosed, and (iii) to the extent permitted by law and requested by the Receiving Party, use commercially reasonable efforts to cooperate with and assist the Disclosing Party in its efforts to obtain (at the Disclosing Party's sole cost and expense) a protective order or other appropriate remedy relating to the Confidential Information to be disclosed by the Receiving Party.

b.    <u>Deliverables</u>. Except as set forth in <u>Exhibit A</u> or as O-I Glass and Paddock may otherwise agree in writing, any tangible deliverables or work product created by or for Service Provider for delivery to Service Recipient in connection with the Services, including, without limitation, any copyrights or other intellectual property rights pertaining thereto (collectively, the "<u>Deliverables</u>"), are hereby assigned by Service Provider to Service Recipient to the extent assignable.

**12.    FORCE MAJEURE**.

a.    <u>Effect of Force Majeure</u>. Neither O-I Glass nor Paddock shall be liable to the other for failure or delay in performance under this Agreement (except for the payment of money due or to become due for past performances) to the extent that the failure or delay is due to force majeure as defined in <u>Section 12(b)</u>. Performance under this Agreement may be suspended (except for the payment of money due or to become due for past performances hereunder) during the period of

7

such force majeure to the extent made necessary by the force majeure, except the settlement of strikes, lockouts, industrial disputes or disturbances shall be entirely within the discretion of the party so settling.  No curtailment, suspension or acceptance of performance pursuant to this Section 12 will extend the term of or terminate this Agreement.  Performance under this Agreement shall resume to the extent made possible by the end or amelioration of the force majeure event.  Upon the occurrence of any event of the force majeure, the party claiming force majeure shall notify the other party promptly in writing of such event and, to the extent possible, inform the other party of the expected duration of the force majeure event and the performance to be affected by the event of force majeure under this Agreement.

      b.      Force Majeure Defined.  For purposes of this Agreement, "force majeure" means war (whether declared or undeclared), fire, flood, lightning, earthquake, storm or any act of God; strikes, lockouts or other labor difficulties, civil disturbances, acts of terrorism, riot, sabotage, any official order or directive or industry-wide request or suggestion by any governmental authority or instrumentality necessary to cease or reduce production; any breakdown of machinery or plant incapable with reasonable efforts of repair within 30 days; or any inability to secure necessary materials, including inability to secure materials by reason of allocations promulgated by authorized governmental agencies which interferes with the performance hereunder; and similar events not within the reasonable control of a party.

      **13.**      **AUDIT RIGHTS**.  O-I Glass and Paddock will have the right at reasonable times, upon reasonable notice and subject to the confidentiality provisions of Section 11 to audit the records of the other party and to interview the employees of the other party, in each case, solely to the extent (i) related to the Services and (ii) necessary to determine whether the Services are being conducted in compliance with Legal Requirements.

      **14.**      **NOTICES**.  Unless otherwise specified, all notices, consents, waivers and other communications under this Agreement shall be in writing and shall be deemed given to O-I Glass or Paddock, as applicable, when (i) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (ii) sent by e-mail with personal confirmation of transmission by the addressee; or (iii) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the addresses or e-mail addresses and marked to the attention of the person (by name or title) designated on Exhibit C (or to such other address, e-mail address or person as O-I Glass or Paddock, as applicable, may designate by notice to the other party):

      **15.**      **NO WAIVER**.  Failure to enforce any right or obligation by either O-I Glass or Paddock with respect to any matter arising in connection with this Agreement will not constitute a waiver as to that matter or to any other matter.  No waiver of any provision of this Agreement or of any Event of Default under this Agreement will be valid or enforceable unless in writing and signed by the party against whom enforcement of the waiver is sought.  The waiver of any provision of this Agreement at any time by either O-I Glass or Paddock does not constitute a waiver of future compliance with such provision or a waiver of compliance with any other provision of this Agreement.

**16.    SUCCESSORS BOUND; ASSIGNMENT**.

a.    <u>Successors Bound</u>.  This Agreement will benefit and bind O-I Glass and Paddock and their respective successors and permitted assigns.

b.    <u>Assignment</u>.  Neither O-I Glass nor Paddock may assign or transfer this Agreement without the prior written consent of the other party, which may be withheld in such party's sole and absolute discretion.

**17.    INVALIDITY**.  The invalidity or unenforceability of any provision of this Agreement or any provision set forth on an <u>Exhibit A</u> will not affect or impair the validity or enforceability of any other provision.

**18.    GOOD FAITH AND FURTHER ASSURANCES**.  O-I Glass and Paddock expressly accept their respective responsibility of good faith and fair dealing with regard to their obligations under this Agreement and agree to take such further actions and execute such further documents as may be reasonably necessary or appropriate to complete and carry out the terms and intent hereof.  If changes in the operations, facilities or methods of either O-I Glass or Paddock will materially benefit one party without detriment to the other party, O-I Glass and Paddock commit to each other to make reasonable efforts to cooperate and assist each other in making such change.  Subject to <u>Section 16(b)</u>, neither O-I Glass nor Paddock will unreasonably withhold, condition or delay its compliance with any reasonable request made under this Agreement.

**19.    HEADINGS**.  All section headings are provided for the purpose of reference and convenience and are not intended to affect the meaning of the content or scope of this Agreement.  This Agreement will be construed according to its fair meaning and not strictly for or against either O-I Glass or Paddock.

**20.    GOVERNING LAW**.  Subject to <u>Section 6</u>, this Agreement and all disputes arising hereunder will be subject to, governed by, and construed in accordance with the laws of the State of Delaware (without regard to conflicts of laws provisions).  **O-I GLASS AND PADDOCK AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF THE PARTIES HERETO WITH RESPECT TO ANY MATTER RELATING TO OR ARISING OUT OF THE ENGAGEMENT OR THE PERFORMANCE OR NON-PERFORMANCE OF THE PARTIES HEREUNDER.**  O-I Glass and Paddock agree, to the extent permitted by applicable law, (i) that any federal court sitting within the District of Delaware shall have exclusive jurisdiction over any litigation arising out of this Agreement; (ii) to submit to the personal jurisdiction of the Courts of the United States District Court for the District of Delaware; (iii) to waive any and all personal rights under the law of any jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to jurisdiction or venue within the State of Delaware for any litigation arising in connection with this Agreement; and (iv) in the event that Paddock commences a voluntary case under title 11 of the United States Code, that (1) the bankruptcy court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement and that each of the parties hereby consents to entry by the bankruptcy court of a final order in any dispute arising out of or related to this Agreement and (2) that O-I Glass shall be

entitled to participate and be heard in any matters implicating, in any way, the scope, extent, timing, or enforceability of, or obligations under, this Agreement.

      **21.** **ENTIRE AGREEMENT**.  This Agreement and Exhibit A and Exhibit B constitute the entire agreement between O-I Glass and Paddock relating to the subject matter hereof.  This Agreement may only be amended or supplemented as set forth in Section 5.

      **22.** **INCONSISTENCIES**.  To the extent that this Agreement and Exhibit A are inconsistent with respect to any Service, Exhibit A will control.

      **23.** **COUNTERPARTS**.  This Agreement may be executed in counterparts, each of which will be an original and all of which together will constitute one instrument.

      **24.** **RECORDS**.  Any Records (as defined below) owned by Paddock will be returned by O-I Glass to Paddock on the earlier of (i) termination of the Service to which such Records relate or (ii) expiration of the retention period for such Records under O-I Glass's Records Retention Schedule.  O-I Glass shall have no obligation or authorization to destroy any Records owned by Paddock and, upon delivery of such Records to Paddock, Paddock shall be responsible for managing its Records according to its own Records and Information Management Program and Records Retention Schedule.  "Records" means, collectively, (i) any document, whether a duplicate or original, that evidences business or commercial activity or is necessary and required for regulatory compliance, regardless of physical or electronic format, and (ii) any file, paper, book, pamphlet, tape, photograph, map, drawing, chart, card or other document, whether a duplicate or original of such materials and regardless of physical or electronic format, in each case of clauses (i) and (ii), (1) to the extent such document or other medium relates to the Services and (2) which has been made or received by O-I Glass hereunder and has been used by O-I Glass as evidence of its activities hereunder.  O-I Glass will provide Paddock, or its designee, reasonable access to inspect and audit, and to copy, the Records, upon five days' prior written notice, during O-I Glass's regular business hours at O-I Glass's office where the Records are maintained in the ordinary course.  Upon written request of Paddock, whether during or after termination of this Agreement, O-I Glass will provide to Paddock, or to any person designated by Paddock, at Paddock's expense and in O-I Glass's then current standard format, all Records prepared and maintained by O-I Glass in connection with the Services.

      *[Signature page follows]*

IN WITNESS WHEREOF, each party hereto has caused this Agreement to be executed by its duly authorized representative as of the date first above written.

**O-I GLASS, INC.**, a Delaware corporation

By: *[signature]*
Name: MaryBeth Wilkinson
Title: Senior Vice President, General Counsel and Corporate Secretary


**PADDOCK ENTERPRISES, LLC**, a Delaware limited liability company

By: _____
Name: John Haudrich
Title: Treasurer and Chief Financial Officer

*[Signature Page to Services Agreement]*

IN WITNESS WHEREOF, each party hereto has caused this Agreement to be executed by its duly authorized representative as of the date first above written.

**O-I GLASS, INC.**, a Delaware corporation

By: _____
Name: MaryBeth Wilkinson
Title: Senior Vice President, General Counsel and Corporate Secretary

**PADDOCK ENTERPRISES, LLC**, a Delaware limited liability company

By: _____
Name: John Haudrich
Title: Treasurer and Chief Financial Officer

*[Signature Page to Services Agreement]*

**EXHIBIT A**
**Services Provided by Service Provider**

**Description**: Subject to the terms and conditions herein set forth, Service Provider will, as requested by Paddock in accordance with Sections 1(b) and (5), as applicable, provide to Service Recipient the following services (as applicable) and such other services as the parties may mutually agree from time to time:

a. Treasury and Procurement Services: Accounts payable and receivable processing, cash management and credit management, including cash management functions, reconciliation services and access to letters of credit.

b. Corporate Finance Services: Managing intercompany finance arrangements, securing working capital loans and performing similar treasury activities, including access to letters of credit.

c. Guaranty and Financial Assurance Services: Issuance, procurement, administration and management of guaranties or other financial assurances with respect to obligations (whether contractual or otherwise) of Service Recipient.

d. Legal and Compliance Support Services: Legal support in areas such as litigation, asbestos claims management and analysis, environmental, IT, intellectual property, real estate and finance, compliance, and labor and employment, including drafting and managing legal documents, reviewing agreements, responding to lawsuits, handling investigations, and providing assistance with respect to other legal issues.

e. Risk Management Services: Managing and overseeing all of Service Recipient's insurance functions, including access to surety programs, and provision of insurance-related services.

f. Global Security: Providing management services to Service Recipient related to access control, executive protection, risk assessment and fraud/theft investigations.

g. Information Technology Services: Services in several principal areas: (i) networks, including providing wide-area data networks or cloud services, and associated technical support; (ii) helpdesk support and software licenses, including global support services for locally-based personnel and coordinating licenses or sublicenses or right to use arrangements for third party software; (iii) applications and systems; including developing applications and integrating certain third party applications; and (iv) management of domain names.

h. Regulatory Audit Compliance Services: Supervising internal and third party consultants performing regulatory audits related to both standards required by law, as well as Service Recipient's own internal corporate and internal control requirements.

i. Commercial Compliance Services: Creating and monitoring internal standards for compliance with antitrust, anti-money laundering, data privacy and global trade laws. With respect to these internal standards, the commercial compliance capability will also facilitate training and awareness programs to support implementation and compliance.

j. <u>Corporate Environmental Services</u>: Providing environmental services such as audit, product stewardship, risk assessment, remediation, permitting, field services and technical support.

k. <u>Corporate Credit Services</u>: Managing Service Recipient's credit and receivables portfolio, and managing Service Recipient's accounts receivable portfolio, invoicing, credit limits, collections and bankruptcy issues, and its bad debt reserve.

l. <u>Corporate Accounting, Tax and Finance Planning Services</u>: Accounting services of financial statements and maintaining oversight for all of Service Recipient's accounting activities, providing guidance to Service Recipient regarding accounting policies, income tax accounting, approval of valuations and other technical issues, and assisting in substantiating data.

m. <u>Travel and Corporate Aviation Services</u>: Managing travel, flight and accommodation services.

n. <u>Asset Management Services</u>: Managing real estate and other assets.

o. <u>Global Information/Records Management Services</u>: Providing information retention services to support Service Recipient's business and operations.

p. <u>Management and Support Services</u>: Providing strategic planning and analysis, providing management and other administrative matters, including operations excellence guidance.

q. <u>Public Relations</u>: Providing support related to public relations matters, such as assistance in developing Service Recipient's image and assistance in improving the relationships between Service Recipient and the public, government and stakeholders.

r. <u>Sales, Marketing and Distribution Services</u>: Providing sales, marketing, advertising and related services.

s. <u>Pension Services</u>: Providing pension planning and related management services, along with access to group plans for affiliates and funding services.

t. <u>Human Resources</u>: Providing payroll processing, reporting, employee onboarding, hiring and other related services, including funding services.

**EXHIBIT B**
**Fees for Services**

Fees

Each Service will be provided to Service Recipient at Service Provider's Cost (as defined below), as determined by O-I Glass in its reasonable discretion, in accordance with this Exhibit B. The term "Cost" represents the direct cost to provide a Service. The intent is to assign to the Service all direct costs including direct labor, direct supervision, benefits, travel and related costs, service-related training, and any direct third party costs incurred to provide the Service. Average departmental labor rates are normally used to charge direct labor to a product or Service. Actual material purchase prices are used to charge direct materials to a product or Service. Paddock understands, acknowledges and agrees that, in establishing the Cost for a Service, O-I Glass may allocate costs for each type of Service among multiple affiliates receiving similar Services in a manner O-I Glass believes to be fair, in its reasonable discretion, with such allocation intended to reflect the relative use of such Service by such affiliates, whether based on relative sales, payroll expense, headcount, number of facilities, capital consumed, complexity of business, actual or estimated time spent, time budgeted, purchases or purchase history, quantity or value of assets or liabilities, or any other commonly accepted method of allocating costs in affiliated groups.

O-I Glass may charge fees or premiums for the issuance by Service Provider of a guaranty or other financial assurance provided with respect to the obligations (whether contractual or otherwise) of Paddock commensurate with the fees and premiums charged by third parties for similar guaranties or other financial assurances.

Paddock acknowledges and agrees that O-I Glass may, at any time and from time to time on not less than ten business days' notice, change the cost allocation methodology employed for any or all types of Services, provided that it is consistent with the paragraphs above.

Paddock also understands and agrees that, with respect to any Services involving the arrangement by Service Provider of goods or third-party services (including any third-party guaranty, surety bond, letter of credit or other financial assurance) for Paddock, in the event that Service Provider incurs any out-of-pocket costs or expenses for any such goods or third-party services, O-I Glass may allocate such out-of-pocket costs and expenses to Paddock.

Paddock also acknowledges and agrees that no employee or department of Service Provider who performs Services for multiple affiliates records the actual time spent by such employee or department providing Services to each of the particular affiliates for which such employee or department performs Services and that, as a result, O-I Glass necessarily may allocate costs for Services provided by employees or departments of Service Provider based on reasonable estimates of the time, rather than the actual time, spent by such employees or departments providing Services to each of the particular affiliates for which such employee or department performs Services.

O-I Glass will determine by line item in Exhibit A the projected cost of Services to be provided in the calendar year and will deliver this projection to Paddock on or before March 1st of such calendar year and every year thereafter. Once agreed, the sum total of these projected costs will be charged to Paddock in advance in four equal quarterly installments. At the conclusion of each

year, O-I Glass will determine the actual cost of the Services provided during the year and provide a comparison to the projected costs to Paddock by March 1st of the following year. Once agreed, any differences between the actual costs and the projected costs charged during the year will be credited or charged, as applicable, to Paddock on the first quarterly invoice billed in the following year.

In the event of a significant change in the scope of Services to be provided outside the annual process described above, the parties agree in good faith to make mid-year changes in projected costs as may be required by the circumstances to avoid significant over or under payments.

Invoicing and Payment

O-I Glass will provide Paddock with an invoice for the applicable Service Fees on a quarterly basis, and all amounts invoiced will be payable within 30 days of the invoice date. Payments not received within such 30 day period will accrue interest at the Base Rate (as defined below) plus 2%. "Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of: (i) the rate of interest established by Fifth Third Bank from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit; and (ii) the Federal Funds Effective Rate (as defined below) in effect from time to time, determined one business day in arrears, plus 1/2 of 1% per annum. "Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a business day, for the next preceding business day) by the Federal Reserve Bank of New York.

## **EXHIBIT C**
**Notice Addresses**

| | |
|---|---|
| If to O-I Glass: | John Reynolds<br>One Michael Owens Way<br>Perrysburg, Ohio 43551<br>Email: john.reynolds@o-i.com |
| If to Paddock: | John Haudrich<br>One Michael Owens Way<br>Perrysburg, Ohio 43551<br>Email: john.haudrich@o-i.com |
| With a copy to: | David J. Gordon<br>Email: dgordon@djoservicesllc.com |